**UNITED STATES of America**

v.

**Edward CLARK Jr., Appellant.**

**No. 92–3191.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1993.

Decided June 7, 1994.

Howard B. Katzoff, Washington, DC, (appointed by this court), argued the cause, and filed the brief, for appellant.

Thomas G. Hungar, Atty., U.S. Dept. of Justice, argued the cause, for appellee. Jay B. Stephens, U.S. Atty. at the time the brief was filed, and Brett M. Kavanaugh, Atty., U.S. Dept. of Justice, were on the brief, for appellee. John R. Fisher, Asst. U.S. Atty., Washington, DC, entered an appearance, for appellee.

Before WALD, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge.

Edward Clark Jr. appeals his conviction for drug possession on the ground that the district court improperly denied his motion to suppress cocaine base discovered in his car. He argues that this evidence should have been excluded because the police did not have reasonable suspicion to stop him and because their use of force converted the stop into an arrest unsupported by probable cause. We hold that the identification of the suspect by an informer provided a sufficient basis for the investigatory stop and that a reasonable fear that the suspect might be armed justified the use of force.

## I. BACKGROUND

The following account is based on police testimony that the district court found credible. In the early evening of November 18, 1991, District of Columbia undercover Detectives Gerald Jordan and Mark Stone were on duty in an unmarked police cruiser. They stopped at a doughnut shop on the 5400 block of Georgia Avenue, N.W. Detective Stone went in to buy some doughnuts and was approached by an individual, Ernest Braxton, who offered to sell him marijuana. Detective Stone agreed, and Braxton left and returned with a ziplock bag containing the drug. The detective then asked Braxton if

his partner could also buy some, and he escorted him to the unmarked vehicle. When the detective opened the door and spoke to Detective Jordan, Braxton apparently saw police radios on the seat and fled.

After a brief chase, Braxton was apprehended and placed under arrest. In an effort to gain favorable treatment, Braxton offered to tell the police where they could find the man who "was holding the stash." He described the man as dressed in black pants and a black jacket and stated that he was at Georgia Avenue and Kennedy Street, N.W.

The officers put Braxton in a car driven by Officer Jewell, who had been called to the scene in order to transport Braxton back to the station. Officer Jewell drove Braxton to Georgia Avenue and Kennedy Street, where they saw a person dressed in black whom Braxton identified as the man with the marijuana. When asked to reconfirm the identification, Braxton did so. At the time, the man (who proved to be appellant Edward Clark Jr.) was in the process of getting into a car on the opposite side of the street.

Acting on this identification, Detectives Stone and Jordan pulled up to Clark's car, parked in front of it, and approached him on foot. Detective Jordan ordered Clark out of the car at gunpoint, patted him around the waist to see if he was armed, and made him kneel at the rear of the car. Detective Stone remained with Clark as Detective Jordan conducted a cursory search of the vehicle for weapons, discovering nothing.

While Detective Jordan was searching the car, Detective Stone told Clark that if they found any drugs, they might have to seize the car. In response, Clark said that the drugs were under the driver's seat. Detective Stone then returned to the car and, on searching it, found a plastic bag with cocaine base in a pocket of the door on the driver's side. Clark was arrested and charged with unlawful possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii).

Prior to trial, Clark moved to suppress the drugs found during the search of the car.

After an extensive suppression hearing, U.S. District Judge Thomas F. Hogan denied the motion. The judge found that the stop had been based on reasonable suspicion because Clark had been identified by Braxton, who was himself "an identified informant," and because Clark's appearance matched the description that Braxton had earlier provided the police. Furthermore, because the police had reason to fear that a suspected drug dealer might be armed, Judge Hogan held that they had not violated the Fourth Amendment when they removed Clark from the car at gunpoint and made him kneel behind it while they conducted the initial search of the car for weapons. The judge also concluded that the second search was valid based on Clark's voluntary and spontaneous statement that there were drugs in the car. After the denial of his motion, Clark entered a conditional plea of guilty to possession in violation of 21 U.S.C. § 844(a).

## II. ANALYSIS

### A. The Law

■ The Supreme Court has long affirmed that, consistent with the Fourth Amendment, a police officer may make a brief investigatory stop of an individual if he acts upon a reasonable, articulable suspicion that the suspect has or is engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968). Whether the police action is reasonable is gauged by the "totality of the circumstances." The Supreme Court has commented that

> [r]easonable suspicion ... is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality— are considered in the "totality of the circumstances—the whole picture," that must be taken into account when evaluating whether there is reasonable suspicion.

*Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990) (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). The evidence giving rise to suspicion must not be "dissected and viewed singly," but taken as a whole; and it must be

"viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Hall,* 525 F.2d 857, 859 (D.C.Cir. 1976).

■ It is also settled that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a patdown search "to determine whether the person is in fact carrying a weapon." *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881. This search is justified by the need "to neutralize the threat of physical harm." *Id.* By the same reasoning, a police officer may ask a suspect to exit his car to enable the officer to conduct a patdown search of the suspect, *Pennsylvania v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 333, 54 L.Ed.2d 331 (1977), and search the passenger compartment of the car for weapons. *Michigan v. Long,* 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983). These decisions recognize the "inordinate risk confronting an officer as he approaches a person seated in an automobile." *Mimms,* 434 U.S. at 110, 98 S.Ct. at 333.

In sum, "[c]ourts have generally upheld stops made at gunpoint when the threat of force has been viewed as reasonably necessary for the protection of the officer." *United States v. White,* 648 F.2d 29, 34–35 (D.C.Cir.1981). If the circumstances dictate, officers "may ... forc[e] the detainee to lie down to prevent flight, ... or draw[ ] [their] guns where [they] reasonably believe they are necessary for their protection." *United States v. Laing,* 889 F.2d 281, 285 (D.C.Cir. 1989) (citation omitted).

In examining the reasonableness of the force used in making a stop, courts have considered such factors as the time of day, the "high crime" nature of the area, a tip that the suspect may be armed, furtive hand movements, flight or attempted flight, a pressing need for immediate action, and the involvement of drugs. *See id.* at 286; *Adams v. Williams,* 407 U.S. 143, 147–48, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972).

**B. Was There Sufficient Basis for a Stop?**

■ Clark argues that the police did not have reasonable suspicion to stop him because they had little cause to believe that Braxton was a reliable informant or that he had any personal knowledge of Clark's criminal conduct. We find, however, that Braxton's identification of Clark provided police with ample justification for an investigatory stop. Detective Stone had caught Braxton selling marijuana and could reasonably assume that he could identify the person who had supplied it. As we noted in *United States v. Chin:*

> Because [the informant] asserted direct personal knowledge of Chin's crime and had himself been caught red-handed, his identification of Chin could be viewed as weightier than a tip from a more distant informant.

981 F.2d 1275, 1278 (D.C.Cir.1992) (Ruth B. Ginsburg, J.). Clark nevertheless argues, on the basis of *Alabama v. White,* 496 U.S. 325, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), that the officers were not entitled to rely on Braxton's tip because of the absence of any corroborating information that would demonstrate his reliability.

In *Alabama v. White,* the Supreme Court found that an investigatory stop based on an anonymous tip was justified because the police's independent corroboration of predictive details gave it sufficient indicia of reliability. *Id.* at 329–32, 110 S.Ct. at 2415–17. Anonymous tips are a category unto themselves. Because they typically do not reveal the informant's basis of knowledge or provide other indicia of reliability, courts generally have insisted that such tips must be supplemented by " '[s]omething more.' " *See id.* at 329, 110 S.Ct. at 2416 (quoting *Illinois v. Gates,* 462 U.S. 213, 227, 103 S.Ct. 2317, 2326, 76 L.Ed.2d 527 (1983)).

Here, the police had the informant in hand and were able to corroborate significant details of his tip. Braxton had stated that the man "with the stash" was dressed in a black coat and black trousers and that he could be found in a particular area. On driving there, the police saw an individual who matched the description and whom Braxton twice identified as the person with the drugs.

Clark nevertheless objects that Braxton could not be considered a reliable source of information because he was himself an admitted criminal, had an incentive to appear to cooperate with the police, and in fact was not trusted by the police. The answer, of course, is that the officers could reasonably believe that precisely because he was actively engaged in drug trafficking, he would know—and thus be able to identify—the source of his trading goods; furthermore, because he was seeking leniency at the hands of the law, Braxton would have little reason to prove himself an unreliable informant. As we noted in *United States v. Davis*, 617 F.2d 677, 693 (D.C.Cir.1979), should the informant "lie to the police," he "risks disfavor with the [police and] prosecution." *See also United States v. Clipper*, 973 F.2d 944, 951 (D.C.Cir. 1992) ("[A]nyone fabricating information runs a risk.").

While it is true that Detective Stone testified that he did not trust Braxton to the degree that he would "go and automatically lock up an individual" on the basis of his information, he nevertheless felt it necessary "to check it out." Suppression hearing transcript ("Tr.") at 30. That, of course, is the purpose of a *Terry* stop, which is based not on certainty but on the need to "check out" a reasonable suspicion. *See Adams*, 407 U.S. at 146, 92 S.Ct. at 1923 ("A brief stop of a suspicious individual ... [to] obtain[ ] more information, may be most reasonable in light of the facts known to the officer at the time.").

### C. Was This a Stop or an Arrest?

Clark also argues that even if the officers had sufficient reason to stop him, Detective Jordan exceeded his authority by forcing him out of his car at gunpoint and making him kneel behind the car while it was searched. He claims that this use of force converted the stop into an arrest unsupported by probable cause and, as a consequence, the evidence secured in the second search should have been suppressed.

■ In *Terry*, the Supreme Court noted that when a law enforcement officer is conducting an investigative stop and

is justified in believing that the individual ... is armed and presently dangerous to the officer ..., it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

392 U.S. at 24, 88 S.Ct. at 1881. The stop will be converted into an arrest, however, if "the amount of force used is 'unreasonable' under the circumstances." *Laing*, 889 F.2d at 285. The questions before us, then, are whether Detective Jordan was "warranted in the belief that his safety ... was in danger," *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, and whether it was reasonable for him to draw his gun and require Clark to exit the car and kneel on the ground in order to ensure his safety while he and Detective Stone conducted their investigation. We conclude that he was, and that it was; and we do so on the authority of our decisions in *White* and *Laing*.

In *White*, police officers drew their guns as they approached a car in which a suspected drug dealer and two others were sitting. The police ordered them out of the car, but the driver failed to comply. When one of the officers observed him making " 'fidgety' hand to lap movements," 648 F.2d at 34, the officer leveled his gun at him, opened the door, and again directed him to leave the car. *Id.* at 31–32. In deciding whether this show of force had converted the stop into an arrest, we "look[ed] for an explanation of why [the guns] were drawn, and whether that precaution was reasonable in light of all the circumstances." *Id.* at 35. We concluded that it was.

Specifically, we noted that the officer had testified that, though the tipster had not said so (and in fact they were not), he was concerned that the suspects might be armed as were a substantial number of the people involved in the 1,000 street drug arrests he had conducted. He thought his prior experiences gave him reason to be concerned about his safety.

*Id.* We found this concern "not unreasonable." *Id.* Nor did we find it unreasonable that an officer should draw his gun as he

approached the car because he could "reasonably anticipate that an arrest may at some point ensue" which might "require a show of force, or provoke an attempt to escape by car, or even an assault." *Id.* at 35 (footnotes omitted).

In this case, Detective Jordan testified that in his 21 years of experience, it was not uncommon for guns and drugs to be associated. He also noted that in an 18–month period, there had been 45 drug arrests and 20 arrests for assault with dangerous weapons within a two-to-three block radius of where the arrest had occurred. Tr. 42–45. And, of course, as in *White,* he and Detective Stone were dealing with a drug suspect who was in a car.

After reviewing the evidence presented at the suppression hearing in light of the relevant Supreme Court case law, Judge Hogan made the following observations:

> Taking a citizen out of a car, putting him on his knees, and then searching the car and then making remarks to the citizen, who then gives the incriminating statement, gets to a point eventually [where] you wonder what the police are limited in doing at all under our law, but I believe the case law supports the actions of the police to that extent, that is, [of] taking Mr. Clark out ... under gun[point] because of the fear of weapons.

> It's very realistic. That's a problem in the District of Columbia today. A police officer had been shot in the near past. The officers know cars have been stopped recently ... in various parts of the city [in] which multiple weapons are found. Officers have been shot at recently.... [I]n a high drug area at night, where someone's been identified as a drug dealer, it does not seem to me ... beyond the purview of our case law or the Constitution that they can take the person out, hold him sufficiently to pat him down and pat the car down, even though it's put the person in detention for a few minutes.

Tr. 147–48.

■ We share Judge Hogan's concerns and agree with his conclusion. There has been a perceptible evolution in this area of the law. Courts today will find a permissible use of force by the police under circumstances that might have raised judicial eyebrows at the time the *Terry* decision was issued. While it was once considered necessary, in order to justify a *Terry* frisk, for a law enforcement officer to be "justified in believing that the individual whose suspicious behavior he is investigating ... *is* armed and presently dangerous to the officer," *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881 (emphasis added), it now suffices, in appropriate circumstances, for the officer to be justified in believing that the individual *might* be armed and dangerous. *See White,* 648 F.2d at 35 ("not unreasonable" for officers to draw guns in approaching car because of concern that suspects "might be armed").

This development is a product of the times. Twenty-five years ago, when the Supreme Court issued its opinion in *Terry,* it might have been unreasonable to assume that a suspected drug dealer in a car would be armed; today, it could well be foolhardy for an officer to assume otherwise. But while the environment within which law enforcement officers are required to work may have changed in recent years, the standard that courts will apply in assessing the legality of their conduct has not. The critical question continues to be: In light of the totality of the circumstances as viewed from the perspective of a prudent and experienced police officer, was the degree of force employed "necessary ... to neutralize the threat of physical harm"? *Terry,* 392 U.S. at 24, 88 S.Ct. at 1881.

Applying this test, we conclude that Detective Jordan did not violate the Fourth Amendment when he used his weapon to require Clark to leave the car and to kneel behind it so that he and his fellow officer could conduct their legitimate investigation in safety. Further, because this use of force did not convert the stop into an arrest, and because Clark had voluntarily informed Detective Stone that there were drugs under the front seat of the car, the detective had probable cause to conduct the search that led to the discovery of the cocaine.

## III. CONCLUSION

Judge Hogan properly denied the motion to suppress the evidence. The investigatory

stop of Clark was sufficiently supported by reasonable suspicion of criminal activity and was not converted into an arrest by Detective Jordan's use of force. Because Detective Stone had probable cause to search the car for drugs, the cocaine was admissible evidence. Accordingly, Clark's conviction is

*Affirmed.*