UNITED STATES of America,
Appellee,

v.

Brad K. EDMONDS, Appellant.

No. 00–3039.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 22, 2001.

Decided Feb. 27, 2001.

Sandra G. Roland, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was A. J. Kramer, Federal Public Defender. Teresa Alva, Assistant Federal Public Defender, entered an appearance.

Suzanne Grealy Curt, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, John R. Fisher, Thomas J. Tourish, Jr. and Adam L. Rosman, Assistant U.S. Attorneys.

Before: WILLIAMS, GINSBURG and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Based on evidence that police officers discovered during a *Terry* stop and subsequent searches, appellant Brad K. Edmonds was convicted of possessing cocaine base within 1,000 feet of a school in violation of 21 U.S.C. § 860(a). Edmonds appeals that conviction, arguing that the evidence introduced against him was obtained in violation of the Fourth Amendment's guarantee against unreasonable searches and seizures. Because we conclude that, considering the totality of the circumstances, the police officer reasonably suspected that appellant was engaged in criminal activity, we hold that he obtained the evidence lawfully. However, the United States introduced no evidence that the school near which appellant was arrested was one of the specific types of schools enumerated in the statute, and we therefore vacate his conviction and remand with instructions that his conviction for a lesser included offense be reinstated.

## I. BACKGROUND

### A. Factual background

In the early evening of May 24, 1999, a group of Washington Metropolitan Police Department officers was patrolling the

4600 block of Livingston Road, SE in Washington, DC. The officers included Sergeant Bruce Feirson, a 21–year veteran who had worked in that neighborhood intermittently for some 14 years. Livingston Road is notorious as one of the many "open air drug markets" infesting the nation's capital and is additionally, in Feirson's words, home to "a series of murders" and the site of "hundreds of arrests and hundreds of incidents, violent incidents." Transcript of Motions Hearing at 6 ("Motion Tr.").

On that particular day, Feirson and his companions were dressed in plainclothes and driving an unmarked car. But according to his testimony, their vehicle—a black Crown Victoria—is regularly used to patrol the neighborhood and is easily identifiable by residents as a police cruiser. As the officers made their way down Livingston Road, Feirson observed a man (later identified as Antonio McFadden) standing on the curb. When McFadden noticed the Crown Victoria, "his eyes got pretty big, and he immediately pivoted, turned away and he began to walk"—rapidly—towards a van located in the parking lot of the nearby Patricia Harris school. *Id.* at 9. McFadden entered the van and seated himself in the front passenger's seat. Appellant Edmonds occupied the driver's seat.

McFadden had left the curb, Feirson believed, because he had recognized him and his companions as police officers. The sergeant's suspicions were further aroused because, he testified, "it is not proper for—it would be illegal for cars to be on school property after hours unless they have some business at the school." *Id.* at 48. Moreover, the parking lot to which McFadden retreated is well-known to officers as the location of numerous drug transactions.

Sergeant Feirson decided to investigate. Exiting the Crown Victoria, he approached Edmonds's van through the parking lot with his police badge prominently hanging from his neck. *Id.* at 21. Feirson could see both Edmonds and McFadden through the van's windshield. As he drew nearer, Edmonds began to make furtive movements: He "lean[ed] forward in the vehicle, move[d] about in the car, and then s[a]t upright, straight back upright in the vehicle." *Id.* at 11. Feirson believed that Edmonds was attempting to hide something—he particularly suspected a weapon or drugs—under the driver's seat.

After reaching the driver's-side door of the van, Feirson asked Edmonds to show him his driver's license and vehicle registration. Edmonds appeared to Feirson to be "extremely nervous," as he was fidgeting in his seat and rapidly blinking his eyes. *Id.* at 11–12. When he failed to produce his registration, Feirson asked him to step out of the van. Edmonds did so—and promptly began sprinting away. As he fled, one of Sergeant Feirson's fellow officers spotted a pistol lying in plain view on the van's floorboard, and shouted out "gun" or "he has got a gun." *Id.* at 13.

Feirson, who after catching Edmonds by the waistband of his pants was dragged several feet, finally tackled him with the assistance of another officer. Because he noticed "a bulge in Mr. Edmonds' left-front-pants pocket" and consequently believed that he was armed, *id.*, Feirson conducted a pat-down search that yielded 40 ziploc bags of crack cocaine and a fully loaded 9mm clip. Officers also recovered a fully loaded 9mm pistol "sticking out" from underneath the van's driver's seat. *Id.* at 16.

### B. Procedural background

Edmonds stood trial on a five-count indictment, charging him with: (1) unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g); (2) unlawful possession of ammunition by a convicted felon in violation of 18 U.S.C. § 922(g); (3) unlawful possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii); (4) unlawful

possession with intent to distribute cocaine base within 1,000 feet of a school in violation of 21 U.S.C. § 860(a); and (5) carrying and possessing a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1).

Before trial, Edmonds moved to suppress the evidence on the grounds that it had been seized during an unconstitutional search. The United States District Court for the District of Columbia heard Edmonds's motion on September 2, 1999, and several days later denied it, concluding that the officers' stop of Edmonds was supported by a. reasonable suspicion and hence was justified under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The court found, as a general matter, that the testimony of Sergeant Feirson, who was the United States' principal witness, was credible. It also found that neighborhood residents could easily identify the officers' unmarked Crown Victoria as a police cruiser. *See* Transcript of Pretrial and Voir Dire, 9/13/99, at 15 ("9/13/99 Tr.").

The court concluded that Edmonds was "seized" within the meaning of the Fourth Amendment at the moment Feirson asked him for his license and registration. *See id.* at 17. It further held that the seizure was a reasonable one. Considering the totality of the circumstances, it was reasonable for an experienced police officer to have suspected that criminal activity was afoot when (1) he was patrolling a neighborhood known for drug trafficking; (2) a man observed him and then fled to a parked van; (3) the van was parked in a school parking lot after school hours; and (4) another person in the van made "furtive gestures" while the officer approached him. *See id.* at 15–17. Because the initial seizure was lawful, the court held, Feirson was entitled to order Edmonds to exit the van after he failed to produce his vehicle registration. And the officers had probable cause to arrest Edmonds, and to conduct a search incident to arrest, because they discovered a gun lying in plain view

of the floor of the van. *See id.* at 20–21. All evidence therefore was deemed admissible.

Edmonds's trial commenced on September 13, 1999. On September 20, the jury returned a guilty verdict on counts three and four (possessing and intending to distribute cocaine base, and possessing and intending to distribute within 1,000 feet of a school, respectively). Because the jury was unable to reach a verdict on counts one, two, and five, the court declared a mistrial as to those counts. At the close of the evidence, Edmonds had moved for judgment of acquittal on count four, arguing that the government had not proved that the school near which he was arrested was one of the types enumerated in 21 U.S.C. § 860(a). *See* Transcript of Testimony, 9/15/99, at 170, 196. His motion was denied but, on March 7, 2000, the court vacated his conviction under count three, finding that it was a lesser, included offense of count four. The court then sentenced Edmonds to a 60–month jail term, from which he now appeals.

## II. DISCUSSION

Edmonds's appeal presents two issues, but only one of them is contested: whether a police officer has a reasonable suspicion sufficient to support a *Terry* stop when (1) he is patrolling a neighborhood known for narcotics trafficking; (2) a man observes him, flees, and enters a van in which the suspect is seated; (3) the van is parked in a school parking lot—where drugs often are sold—after school hours; and (4) the suspect makes "furtive gestures," apparently attempting to conceal an item under the driver's seat, while the officer approaches the van. As to the second issue, whether a defendant can be convicted of violating 21 U.S.C. § 860(a), which criminalizes the distribution of drugs within 1,000 feet of, among others, "a public or private elementary, vocational, or secondary school," when the government fails to introduce any evidence that the school near which he was arrested was one of the

specific types of schools enumerated in the statute, the parties are in accord. Edmonds's conviction on count four must be vacated and his case remanded with instructions that his conviction on count three—a lesser included offense—be reinstated.

### A. Constitutionality of the search

We define the scope of our inquiry. Edmonds does not challenge the district court's determination that he was not seized until Sergeant Feirson asked to see his license and registration. Nor does he contend that the seizure of the pistol lying in plain view on the van's floorboard and of the cocaine and 9mm clip found during a pat-down was unlawful on any other ground than the asserted unconstitutionality of the initial *Terry* stop. Edmonds's entire appeal hangs on the proposition that, in light of the circumstances on the evening of May 24, 1999, it was unreasonable for Sergeant Feirson to suspect that criminal activity was afoot. It was not.

■ In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court carved out an exception to the warrant requirement of the Fourth Amendment. The Fourth Amendment's prohibition on unreasonable searches and, seizures ordinarily requires all such encounters to be conducted pursuant to a judicially issued warrant—that is, the criterion by which the reasonableness of a given search or seizure typically is measured is whether it was authorized by a warrant. *See California v. Acevedo*, 500 U.S. 565, 582, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (Scalia, J., concurring in the judgment) ("Although the Fourth Amendment does not explicitly impose the requirement of a warrant, it is of course possible to consider that implicit within the requirement of reasonableness."). But the *Terry* Court made an exception for "brief encounter[s] between a citizen and a police officer on a public street," *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000), which involve

"necessarily swift action predicated upon the· on-the-spot observations of the officer on the beat." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868.

■ In the same way that such encounters—"*Terry* stops," as they have come to be known—need not proceed pursuant to a warrant, neither must they be supported by probable cause. Instead, an officer may briefly detain a citizen if he has a reasonable, articulable suspicion that "criminal activity may be afoot." *Id.* at 30, 88 S.Ct. 1868. "The officer need not be absolutely certain that the individual" is· engaged in an unlawful enterprise; "the issue is whether a reasonably prudent man in the circumstances would be warranted in his belief" that the suspect is breaking, or is about to break, the law. *Id.* at 27, 88 S.Ct. 1868. As the Supreme Court recently explained, reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123, 120 S.Ct. at · 675–76. Hence a *Terry* stop requires only a "minimal level of objective justification," *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984), and an officer may initiate one "based not on certainty, but on the need to 'check out' a reasonable suspicion." *United States v. Clark*, 24 F.3d 299, 303 (D.C.Cir.1994).

■ When determining whether a *Terry* stop was supported by reasonable suspicion, this Court does not separately scrutinize each factor relied upon by the officer conducting the search. *See United States v. Sokolow*, 490 U.S. 1, 8–9, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). An officer on the beat does not encounter discrete, hermetically sealed facts. Rather, as we repeatedly have cautioned, the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them. *See Clark*, 24 F.3d at 301–02 ("The evidence giving rise to suspicion must not be

'dissected and viewed singly,' but taken as a whole; and it must be 'viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training.'" (quoting *United States v. Hall*, 525 F.2d 857, 859 (D.C.Cir. 1976))). An officer's training and experiences enable him to "draw[ ] inferences and make[ ] deductions" from seemingly innocuous facts—"inferences and deductions that might well elude an untrained person." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Hence even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors—especially when viewed through the eyes of an experienced officer—may.

■ In this case, the district court identified four factors that, when considered in their totality, established the reasonableness of Sergeant Feirson's suspicion that Edmonds was engaging in criminal activity: (1) Livingston Road's notoriety as an "open air drug market"; (2) Edmonds's presence in a van parked after hours in a school lot known to be the site of numerous drug transactions; (3) the "furtive gestures" made by Edmonds as Feirson approached the van; and (4) the perception that McFadden, Edmonds's companion, began to flee when he noticed the officers' unmarked car. We find that the first three factors are sufficient to amount to reasonable suspicion, especially in light of McFadden's apparent attempt to evade the officers.

■ As for the first factor, the probative value of a neighborhood's reputation as a high-crime area is firmly established. Of course, the fact that a given locale is well known for criminal activity will not *by itself* justify a *Terry* stop; but it is among the various factors that officers may take into account. *See, e.g., Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676 (emphasizing that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable,

particularized suspicion that the person is committing a crime," but stressing that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C.Cir.2000) ("While obviously insufficient by itself to amount to reasonable suspicion, this is among the relevant contextual considerations in a *Terry* analysis." (citation omitted)). Edmonds simply misstates the law when he asserts that Livingston Road's disproportionately high crime rate "adds little" to the reasonable-suspicion calculus. Brief for Appellant at 21.

In this case, the United States submitted evidence to the district court that the 4600 block of Livingston Road suffers from a high incidence of crime. Sergeant Feirson testified that, in the last five years, he has been involved in "15 or 20 arrests" in the neighborhood, and described it as "an extremely high crime area." Motion Tr. at 6. The government introduced evidence that the neighborhood is particularly known for its prevalence of narcotics trafficking and violent crime. Feirson more than once described Livingston Road as an "open air drug market[ ]," and elaborated that "[p]rimarily cocaine, but marijuana is also sold up there." He also testified that "there has been a series of murders that I am familiar with up in that area and shootings. There have been hundreds of arrests and hundreds of incidents, violent incidents up there." *Id.* In other words, the government established not just that Livingston Road suffers from general, undifferentiated "crime," but that it is home to the precise type of infractions—drug and firearm offenses—that Feirson suspected Edmonds of committing.

■ The second factor is equally probative of criminal activity as courts recognize that a car parked in the lot of a closed establishment can contribute to an officer's reasonable suspicions. For example, in an

Eighth Circuit case closely paralleling this one, *United States v. Dawdy*, 46 F.3d 1427 (8th Cir.1995), an officer "observed Dawdy and his passenger parked after 10:00 pm on a Sunday night at the back of the otherwise deserted pharmacy parking lot," a pharmacy that was known to have been burglarized several times in the recent past. *Id.* at 1430. That court held that "the presence of two men sitting in a parked automobile at night," when coupled with the possibility that the suspect may have attempted to drive away, "was sufficient to lead a trained law enforcement officer to suspect that a crime was being committed and to justify the initial stop." *Id.*

We need not—and do not today—adopt the *Dawdy* court's apparent suggestion that the parked car scenario is *by itself* sufficient to justify a *Terry* stop. *See id.* at 1432 (Lay, J., dissenting) ("This Court has now, for the first time in this or any other circuit, determined that police can seize, detain, and question an individual (or individuals) knowing nothing more than the fact that the person's car is parked legally in a mixed commercial/residential area at night."). But we do recognize that a car parked in the lot of a then-closed establishment that is the site of occasional criminal activity is a factor that may strongly support an officer's reasonable suspicions.

In this case, Sergeant Feirson observed Edmonds and McFadden parked in the school's lot at around 7:00 PM, a time when the school was known to be closed, as was the pharmacy in *Dawdy*. And, again as in *Dawdy*, Sergeant Feirson knew that crimes—in this case, drug transactions—often were committed in the school's parking lot. It is unclear whether vehicles in addition to Edmonds's van were parked at the school. As Edmonds points out, Feirson initially testified that it is "unusual" for cars to park in the school lot after hours, but admitted on cross-examination that "I am sure that there are [other] cars that park on that parking lot

after hours, yes." Motion Tr. at 10, 49. But it is difficult to see why this matters. What triggered Feirson's suspicion was not simply the after-hours presence of a parked van, but of a parked van with two men sitting in it—one of whom had already drawn the officer's notice by his suspicious behavior. There is no evidence that any of the other cars parked at the school—if indeed other cars *were* parked at the school—also contained passengers. The presence of other cars would not inherently have led Feirson to be any less suspicious of Edmonds's van, especially given the approach by its passenger from the street rather than from the direction of the school, which could reasonably heighten the suspicion that the occupants had no legitimate after-hours business with the educational institution.

■ Third, this Court recognizes that "furtive" gestures in response to the presence of the police can serve as the basis of an officer's reasonable suspicion. In *United States v. Green*, 465 F.2d 620 (D.C.Cir. 1972), we held that officers were justified in conducting a *Terry* stop when they halted a car for a traffic infraction and "observed the driver making furtive movements as though pulling something out of his belt and placing it under his seat." *Id.* at 623. Here, Sergeant Feirson testified that he could see Edmonds through the van's windshield as he approached the vehicle, and that he noticed Edmonds reaching under the driver's seat as though he were attempting to conceal something. "I saw the Defendant lean all of the way forward," he recalled, "almost ducking out of my sight. I could see his head above the dashboard, and then I saw him lean back, up, seated upright in the vehicle." Motion Tr. at 11.

Of course, a suspect's movements are not by themselves enough to support a reasonable suspicion of criminal wrongdoing; furtive gestures "are significant only if they were undertaken in response to police presence." *Johnson*, 212 F.3d at 1316. And a suspect can respond to the

presence of a police officer only if he has recognized him as an officer. In this case, there can be no serious doubt that Edmonds recognized Sergeant Feirson as an officer. Feirson testified that he was prominently wearing his police badge on his chest. Motion Tr. at 21. Since Feirson further testified that he could observe Edmonds through the van's windshield, it is a fair inference that Edmonds in turn saw Feirson, perceived his badge, recognized him as a police officer, and reacted by making furtive gestures. Indeed, during cross-examination, in an attempt to establish that Edmonds was "seized" before Feirson demanded his license and registration, Edmonds's attorney asked the officer "And it was a police badge, anyone could tell that you were a police officer with a badge; right?" To which Feirson replied "Right." *Id.* at 22.

This case thus is easily distinguishable from *Johnson*, in which we doubted that the suspect's initial attempt to conceal an object under his car seat gave rise to a reasonable suspicion of wrongdoing (although we held that his later movements did). *See Johnson*, 212 F.3d at 1316 ("If the seizure had taken place at that point, we doubt very much whether it would have been valid."). The reason why Johnson's first round of furtive gestures did not justify a *Terry* stop was because "[i]t is not clear that Johnson was aware that [the observing officer] was a police officer; [the officer] was after all in an unmarked car." *Id.* In this case, by way of crucial contrast, Feirson had his police badge prominently displayed on his chest as he approached the van.

These three factors, when considered in their totality and through the eyes of an experienced police officer on the street, are sufficient to have led Sergeant Feirson reasonably to suspect that Edmonds was engaged in unlawful activity. Moreover, it was reasonable for Feirson's suspicions to be aroused in the first instance by McFadden's apparent flight and retreat to Edmonds's van. As we noted above, the dis-

trict court found that Feirson was aware that his Crown Victoria was readily recognizable as a police vehicle. That McFadden, immediately upon observing that vehicle, hastened to the van to join its driver, could at least raise a suspicion that whatever was going on in the van had nothing to do with legitimate presence in the parking lot, raising the strong possibility, given the other facts discussed above, that it was criminal activity.

The Supreme Court recently held that "[h]eadlong flight ... is not necessarily indicative of wrongdoing, but it certainly is suggestive of such." *Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676; *see also California v. Hodari D.*, 499 U.S. 621, 623 n. 1, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (" 'The wicked flee when no man pursueth.' " (quoting Proverbs 28:1)). This case is not like *United States v. Johnson*, 496 A.2d 592 (D.C.Ct.App.1985), in which the Court of Appeals of the District of Columbia stated that "one person's flight is imputable to another only if other circumstances indicate that the flight from authority implies another person's consciousness of guilt as well," before holding that three suspects' joint presence in a vehicle enabled officers to "conclude that all three were associated in a venture of some sort." *Id.* at 597. Rather, in this case the flight of McFadden to the van contributed to a reasonable suspicion that criminal activity might be afoot in the vehicle. This case involves direct, not transferred, suspicion. Acting upon that reasonable suspicion, the investigating officer approached the van and observed the other factors which we have enumerated above, further contributing to his reasonable suspicion and supporting his *Terry* stop of Edmonds.

In sum, it was reasonable for Sergeant Feirson to suspect that Edmonds was engaged in illegal activity. Because Feirson had a reasonable suspicion that "criminal activity may [have] be[en] afoot," *Terry*, 392 U.S. at 30, 88 S.Ct. 1868, the initial stop was justified, and the evidence the officers subsequently obtained was lawfully

introduced. The district court did not err in refusing to suppress the evidence.

### B. Sufficiency of the evidence

 Besides challenging the *Terry* stop, Edmonds argues alternatively that the United States introduced no evidence at trial that the school near which he committed a drug offense was one of the specific types of schools enumerated in 21 U.S.C. § 860(a). Both parties agree that the government failed to lay a factual foundation that would have enabled the jury to conclude that "the Patricia Harris school," Opening Statements and Testimony, 9/14/99, at 36, was one of the statutorily specified schools. They further agree that Edmonds's conviction on count four—possessing and intending to distribute cocaine base within 1,000 feet of a school—must be vacated, and that the case should be remanded with instructions to reinstate his conviction on count three—possessing and intending to distribute cocaine base—a lesser included offense.

21 U.S.C. § 860(a) makes it unlawful for a person to participate in a drug transaction within 1,000 feet of an "elementary, vocational, or secondary school or a . . . college, junior college, or university." Section 860(a) does not apply to *all* types of schools, but only to the ones that are specifically enumerated in the statute's text. Hence to prove a violation of § 860(a), the United States must establish beyond reasonable doubt that the school near which the defendant committed a drug crime is one of the statutorily specified types. *Cf. United States v. Hawkins,* 104 F.3d 437, 440 (D.C.Cir.1997) (holding that § 860(a) is not violated where a drug offense is committed within 1,000 feet of a "school building that is no longer (or not yet) in use as a school").

 In other words, the character of the school is an element of the offense that, like all elements, must be proved beyond a reasonable doubt. *See United States v. Gaudin,* 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (stressing that the Sixth and Fourteenth Amendments guarantee a criminal defendant the right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt"); *see also Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 2368, 147 L.Ed.2d 435 (2000) (Thomas, J., concurring) (arguing that "every fact that is by law a basis for imposing or increasing punishment" is an element of the offense).

Here, the only evidence the United States submitted at trial was that Edmonds had committed a drug offense in the vicinity of "the Patricia Harris school." 9/13/99 Tr. at 36. During the pretrial hearing on Edmonds's motion to suppress, a government witness had described the school alternately as "a local high school" and a "junior high school," Motion Tr. at 9—either of which seemingly would meet § 860(a)'s definition of a "secondary school." But during the trial itself, the government made no effort to show that "the Patricia Harris school" is indeed one of the types of schools specified in 21 U.S.C. § 860(a). Because the United States failed to introduce any evidence that Edmonds committed that element of the offense, no jury properly could have found beyond a reasonable doubt that he violated § 860(a).

A similar issue was presented in *United States v. Smith,* 13 F.3d 380 (10th Cir. 1993), where the Tenth Circuit applied a statute making it unlawful to sell drugs within 1,000 feet of a "playground." The statute further defined "playground" as "any outdoor facility . . . intended for recreation, open to the public, and with any portion thereof containing three or more separate apparatus intended for the recreation of children. . . ." 21 U.S.C. § 860(d). At trial, the only evidence introduced by the government was that Crawford Park, the location of defendant's drug sale, had "playgrounds, walking paths, [and] gazebos." *Smith,* 13 F.3d at 382. It produced no evidence that Crawford Park had three or more recreation apparatus. "Because

the testimony does not meet the requirements of the definition of a playground set forth in 21 U.S.C. § 860(d), a reasonable jury could not convict Mr. Smith beyond a reasonable doubt of an offense which requires activity 'within 1,000 feet of a ... playground' as an element." *Id.* Just so here.

We therefore vacate Edmonds's conviction for violating 21 U.S.C. § 860(a), and remand with instructions that the district court reinstate his conviction for violating 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii), a lesser included offense. The prosecution might well have avoided this additional stage of litigation by doing before the jury what it did at the suppression hearing: simply asking its witness to fully describe "the Patricia Harris school."

### III. CONCLUSION

The district court properly concluded that the police officers had a reasonable suspicion to conduct a *Terry* stop of Edmonds, since they were patrolling in a high-crime area, observed Edmonds sitting in a van parked after hours in a school lot, and saw him conceal an object under his seat. Because the initial stop was lawful, the evidence obtained in subsequent searches need not be suppressed. However, the district court erred in refusing to grant Edmonds's motion for judgment of acquittal, as the United States introduced no evidence that the school near which he was arrested was one of the specific types of schools enumerated in 21 U.S.C. § 860(a). Edmonds's conviction on count four therefore is vacated, and the case is remanded with instructions that his conviction on count three be reinstated.