# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued October 15, 2004        Decided January 11, 2005

No. 03-3119

United States of America,
*Appellee*

v.

Ricky Moore,
*Appellant*

————

Appeal from the United States District Court
for the District of Columbia
(No. 03cr00104-01)

————

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for appellant Ricky Moore. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Mary M. Petras* and *Neil H. Jaffee*, Assistant Federal Public Defenders, entered an appearance for appellant Ricky Moore.

*Thomas J. Tourish, Jr.*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, *John R. Fisher*, *Alexander D. Shoaibi* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: GINSBURG, *Chief Judge*, and HENDERSON and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: Ricky Moore appeals his conviction for possession of a firearm by one "who has been convicted in any court of ... a crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 922(g)(1). He argues the police did not have a reasonable suspicion he was engaged in criminal activity, wherefore they were not authorized to seize him pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and the gun discovered as a result of that seizure must be suppressed. Considering the totality of the circumstances -- it was four o'clock in the morning when police officers observed a taxicab starting and stopping several times in an area where someone would not generally be picked up or dropped off by a taxicab and where taxicab drivers had recently been robbed -- we hold the police had reason to suspect the taxicab driver was being robbed and to stop his taxicab and thereby seize the passenger, Moore.

Moore also appeals his sentence, claiming first the ineffectiveness of his counsel caused him to forfeit an additional one-level reduction for acceptance of responsibility under § 3E1.1(b) of the United States Sentencing Guidelines. We hold the performance of Moore's counsel was not deficient, let alone constitutionally deficient. Alternatively, Moore argues we should remand his case to the district court for a new sentencing hearing because the district court improperly relied upon the Government's preparation for the suppression hearing in denying his request for relief under § 3E1.1(b)(2), and failed to rule upon his request for relief under § 3E1.1(b)(1). We conclude the district court did neither. We therefore affirm both Moore's conviction and his sentence.

## I. Background

Shortly after 4:00 a.m. on February 13, 2003 Lieutenant Nathan Sims and his watch commander, Lieutenant Debra Manigault, were traveling south on Interstate 295 near the 1000 block of Kenilworth Avenue, N.E., a location Lt. Sims characterized as part of "a high crime area" in general and specifically as an area where there had recently been "crimes involving cabs." Lt. Sims "observed a cab on the service road" alongside Kenilworth, which is a "ramp" used to "get on 295 or to proceed straight onto Burroughs Avenue." Although there were several houses in the vicinity, Lt. Sims first saw the taxicab stopped in an area where there was "nothing ... but open field, grassy area" -- not a place where one would normally hail or alight from a taxicab. The taxicab had "its interior light on .... with an individual sitting in the back seat." Lt. Sims "observed the cab driver start moving, and all of a sudden he stopped. He did this maybe two or three times." Lt. Sims immediately suspected the driver was in danger: "I told my partner, hey, this cab driver is about to get robbed."

Lt. Sims stopped the taxicab and ordered the passenger, Ricky Moore, to get out. Lt. Sims then frisked Moore and discovered a firearm in his possession. Moore was arrested and, having previously been convicted of an offense punishable by more than one year's imprisonment, was charged with violating 18 U.S.C. § 922(g)(1).

Moore later moved to suppress the gun, pursuant to the Fourth Amendment to the Constitution of the United States, on the ground that the police did not have a reasonable suspicion upon the basis of which to stop the taxicab. After a hearing, the district court, although it considered the question "somewhat close on the facts," denied Moore's motion. Thereafter the

Government offered Moore a conditional plea agreement, reserving Moore's right to appeal the district court's denial of his motion to suppress. Moore's counsel, Mr. Billy Ponds, asked the court to schedule the plea for the following week, and the court set it down for April 25. When that day came, however, Moore had decided not to plead guilty. As Mr. Ponds explained to the court:

> Your Honor, Mr. Moore has indicated to me that it's his desire to have a trial. This decision is his decision. I've consulted with him in terms of my opinion ... but, you know, as I've told him, despite anybody's opinion, he has a constitutional right to have a trial, despite how anybody feels about the evidence. And I'd ask the Court to set a trial date.

When the court thereupon questioned Moore himself about his decision, the defendant stated, "I'm confused .... I was led to believe that my case was going to be dismissed .... Now it's plead guilty." The district court explained to Moore that, although the court had already denied his motion to suppress, Moore would be able to appeal that issue regardless whether he pleaded guilty or went to trial; "the difference is in the sentence." The court went on to estimate Moore's sentence, and to explain the potential reductions for acceptance of responsibility under § 3E1.1(a) and (b).

After diligently explaining the plea agreement to Moore, the court asked the parties how they wished to proceed, and Moore said, "I just want to ask my mother." The court obliged with a short recess, after which Moore stated he wanted to plead guilty. Beginning the process of accepting the plea, the court informed Moore that "in addition to advising you of your rights I'm going to ask you questions about what happened and you're going to have to admit that you did it." Moore balked: "What do you

mean I've got to admit that I did it?" The court explained that Moore would have to admit to the facts recounted in the plea agreement, which Moore had acknowledged he had read and discussed with Mr. Ponds.

Hearing Moore's confusion, the court offered Moore an opportunity to reconsider his plea:

> Do you want to plead guilty today? Do you want to talk about it some more with your mother and with your lawyer? Some day there's going to come a point where you're going to have to make a decision. It doesn't have to be today. If you're not ready to plead guilty, we can set a trial date and see what happens in the next couple of days.

At that point, Mr. Ponds made the following comment, upon the basis of which Moore now claims he provided constitutionally deficient assistance:

> Judge, I don't feel comfortable at this point in terms if a plea was taken today, and this is just my opinion. Mr. Moore can speak for himself. That the question of voluntariness -- I know the mother has spoken to him extensively .... I would ask the Court -- we can select a trial date. I would still like to have the opportunity to come back before the Court before the trial date to let the Court know whether or not he wants to accept the plea. Hopefully the Government will allow the plea to remain open. So that it could never be alleged that well, you know, I pled guilty because my mother told me to do it and, you know, I pled guilty because of her, and the judge gave me time and she pressured me and ... Mr. Ponds pressured me. I just don't feel comfortable with that .... I know that Mr. Moore is aware of all the contents of the plea agreement, he's had it in his possession for at least more than 24 hours, and what

I would ask the Court to do, and also in fairness to him ... to give him another opportunity to just let it all kind of settle in and let us come back before the Court where all of this advice that he's received has settled in and ultimately it should be an easy decision for him then.

In response, the Government agreed it "would not revoke the plea offer," and the district court then set the trial for May 2, asking counsel how many witnesses there might be and for submissions of voir dire questions and of jury instructions. The court also instructed them that "if in the meantime ... you all have further discussions and Mr. Moore decides he ... want[s] to plead guilty instead of going to trial, talk to [the clerk] about when you can come in."

In the interim, however, difficulties between Moore's family and Mr. Ponds caused the lawyer to file a motion to withdraw as counsel. On May 20, those difficulties apparently having been resolved, the court noted that "Mr. Moore wants Mr. Ponds as his lawyer and we're going to have a trial," which the court then re-scheduled for June 9.

When the day for trial came the district judge who had handled the case theretofore was unavailable and another judge proceeded in his absence. To apprise the court of the background, Mr. Ponds stated:

The case has gone back and forth. We've litigated the pretrial motions in this case and they've been denied. There was a plea offer extended to Mr. Moore which Mr. Moore signed. The plea agreement was fully explained to him by me on two different occasions. Judge Friedman took probably about 30 minutes going through aspects of the plea with Mr. Moore. I spoke with Mr. Moore this morning. He indicates he doesn't understand the plea offer.

He's indicated -- there's some indication he wants to go to trial.

The court then heard from Moore, who said:

I don't understand the plea and I'm trying to get new counsel because my mother can't afford to pay Billy Ponds. She said she couldn't ....  I didn't say I didn't want to do it. I just want to know what I'm getting myself into before I do it ....  I don't really understand it ....  I mean what am I facing and everything.

Upon hearing all this, the court decided that Mr. Ponds' relationship with Moore "may not be a fully successful attorney-client relationship"; the court therefore appointed the Federal Public Defender to take over as Moore's counsel and recessed to allow the new counsel a chance to confer with Moore.  Even after new counsel had "discuss[ed] the guidelines extensively" with Moore, and "talked in detail about the various possibilities," however, Moore was still "not prepared to go forward with the plea" that day.  Counsel informed the court that Moore again wanted a chance to speak with his family "to help him make this decision."  The court again obliged but warned, "He's either going to plea[d] on Friday [June 13] or he's not going to plea[d].  Enough of this yes I am, no, I'm not, yes, I am, no, I'm not."  On June 13 Moore pleaded guilty.

Under § 3E1.1(a) of the United States Sentencing Guidelines in effect as of the date of Moore's offense,[*] the

---

[*] The version of § 3E1.1 in effect when Moore committed his offense permitted the district court to reduce a defendant's sentence by three levels for his acceptance of responsibility regardless of the Government's position.  Under the 2003 amendments to the Sentencing Guidelines, the district court may

district court may reduce by two the offense level of a defendant who "clearly demonstrates acceptance of responsibility for his offense." A defendant who qualifies for a decrease under § 3E1.1(a) may receive an additional reduction of one level under § 3E1.1(b) if he

> has assisted authorities in the investigation or prosecution of his own misconduct by ...
>
> (1) timely providing complete information to the government concerning his own involvement in the offense; or
>
> (2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently.

At sentencing, the district court granted Moore a two-level reduction for acceptance of responsibility under § 3E1.1(a) but denied him the additional one-level reduction available under subsection § 3E1.1(b). In so doing, the court agreed with defense counsel that "there may have been a failure of communication between Mr. Ponds and Mr. Moore ... and ... that ought not to be held against Mr. Moore." Nevertheless, the court concluded, "Clearly the government prepared for trial -- they didn't just have to prepare for a motions hearing but they had to file voir dire questions, other filings and jury instructions." Accordingly, pursuant to the Guidelines, the court calculated Moore's offense level at 20 which, with his Category II Criminal History, yielded a range of 37–46 months.

---

still grant a two-level reduction, but the third level may be granted only "upon motion of the government."

The court sentenced Moore to 40 months' imprisonment. With the additional one-level reduction, Moore's range would have been 33–41 months.

## II. Analysis

Moore presses two primary contentions on appeal. First, Moore argues the district court erred in denying his motion to suppress the gun because the police did not have a reasonable suspicion upon the basis of which to stop the taxicab. Second, Moore argues Mr. Ponds provided constitutionally ineffective assistance because he "intervened to stop the plea proceedings ... and asked the court to schedule a trial instead," thereby causing Moore to forfeit the additional one-level reduction for acceptance of responsibility under § 3E1.1(b) of the Sentencing Guidelines. Alternatively, Moore argues we should remand the case for the district court to reconsider whether he is entitled to the third-level reduction because the district court improperly relied upon the Government's preparation for the suppression hearing in denying him relief under § 3E1.1(b)(2) and failed to rule upon his request under § 3E1.1(b)(1).

## A. The Stop

A police officer "may briefly detain a citizen if he has a reasonable, articulable suspicion that criminal activity may be afoot." *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001). This "reasonable suspicion" standard is "less demanding ... than probable cause ...." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). In any particular case, "the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them." *Edmonds*, 240 F.3d at 59.

We review the district court's findings of "historical fact"

only for clear error, giving "due weight to inferences drawn from those facts by ... local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We review *de novo* the district court's determination that, in the circumstances of this case, the arresting officer had a reasonable suspicion Moore was "breaking, or [was] about to break, the law." *Edmonds*, 240 F.3d at 59.

The court's "first task" in applying *Terry v. Ohio* "is to establish at what point in this encounter the Fourth Amendment becomes relevant." 392 U.S. 1, 16 (1968). The Government and Moore agree he was "seized" within the meaning of that amendment when Lt. Sims stopped the taxicab in which he was a passenger. The issue that divides them is whether at that moment the police had a reasonable suspicion Moore was attempting to rob the driver.

Considering the totality of the circumstances, we conclude the police were justified in stopping the taxicab when they did. Lt. Sims had observed the taxicab starting and stopping several times at a place "where people wouldn't normally get a cab or get dropped off from a cab." Such erratic movements would naturally strike a police officer as suspect. They were rendered even more suspicious considering it was 4:00 a.m. in a high-crime area where there had recently been robberies of taxicab drivers. As the Supreme Court has noted, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124. The location is particularly probative in this case because "the government established not just that [the area] suffers from general, undifferentiated 'crime,' but that it is home to the precise type of infractions ... [the officer] suspected." *Edmonds*, 240 F. 3d at 60.

Of course, as Moore points out, there are plausible non-criminal explanations of everything the officers saw. Moore instances: "At that time of year and hour of the morning, snow or water in the road could have turned to ice and it might have been prudent for the driver to test his brakes," or perhaps "someone could have been consulting a map." No doubt. Our inquiry, however,

> does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same -- and so are law enforcement officers.

*United States v. Cortez*, 449 U.S. 411, 418 (1981). Lt. Sims' suspicion the taxicab driver was being robbed was among the most probable explanations for the peculiar circumstances he observed; it was reasonable to suspect that a taxicab driver, while being robbed, would behave erratically, whether from shock or confusion, or perhaps in the hope of attracting the attention of the police.

We conclude, therefore, the police had a reasonable suspicion upon the basis of which to stop the taxicab. Moore does not contest the lawfulness of the frisk incident the stop. Hence we affirm the district court's denial of Moore's motion to exclude the gun from evidence.

B. Relief Under § 3E1.1(b)

Moore makes three arguments respecting the third-level reduction for acceptance of responsibility under the Sentencing Guidelines, as detailed below.

1.  Ineffective assistance of counsel

In order to succeed upon his claim of ineffective assistance of counsel, Moore must prove (1) Mr. Ponds "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). In this context a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. As we have recently explained,

> Due to the fact-intensive nature of the *Strickland* inquiry and the likelihood, when a defendant asserts his sixth amendment claim for the first time on direct appeal, that the relevant facts will not be part of the trial record ... this court's general practice is to remand the claim for an evidentiary hearing unless the trial record alone conclusively shows that the defendant either is or is not entitled to relief.

*United States v. Rashad*, 331 F.3d 908, 909-10 (D.C. Cir. 2003). In this case, Moore's claim of ineffective assistance is based principally upon Mr. Ponds' performance at the hearing on April 25. The relevant facts, as recounted above, are matters of record so there is no need to remand for an evidentiary hearing.

Specifically, Moore contends Mr. Ponds rendered ineffective assistance by interrupting the district court's acceptance of his guilty plea on April 25, 2003. According to Moore:

> There was no valid strategic reason for counsel to request a trial date ... [rather than] ask[ing] for the court's leave to

confer with his client about the pros and cons of entering a prompt plea, given the risk that delay might make him ineligible for the third point reduction .... At a minimum, counsel should have asked the court to schedule a status conference or another plea hearing to give his client more time to consider the plea, instead of a trial date one week later.

Moore argues further that "[b]ut for counsel's interruption and request for a trial date, the court would have continued the hearing and accepted the plea, and Mr. Moore would have been clearly eligible for the third-point reduction."

Contrary to Moore's contention, the record shows it was not Mr. Ponds who interrupted Moore's plea, but rather the district court responding to Moore's question. Even after the district court had explained both the plea agreement and the Sentencing Guidelines to Moore at great length and had granted a recess for Moore to talk with his mother and with his lawyer, Moore made it clear he did not yet understand the plea by asking, "What do you mean I've got to admit that I did it?" Hearing Moore's confusion, the district court appropriately explained, "If you're not prepared to admit to the facts, then there's probably no plea agreement." Rather than continuing with Moore's plea, the court stopped to allow Moore to reconsider:

Do you want to plead guilty today? Do you want to talk about it some more with your mother and with your lawyer? Some day there's going to come a point where you're going to have to make a decision. It doesn't have to be today. If you're not ready to plead guilty, we can set a trial date and see what happens in the next couple of days.

It was only after the district court had thus apprised Moore of his options and offered to wait further for Moore to decide

whether to plead guilty, that Mr. Ponds rose to offer "just my opinion. Mr. Moore can speak for himself." Like the district court, Mr. Ponds had observed that Moore was apparently still confused despite the court's thorough explanation of the plea agreement in open court and the recess during which Moore had consulted his mother. Mr. Ponds was therefore understandably concerned that his client was not yet ready to plead guilty. Perhaps also perceiving that the district court's patience was beginning to wear thin, counsel reasonably endorsed the option the district court had just offered: "set a trial date and see what happens in the next couple of days," -- if, but only if, the Government would leave the plea offer open. The Government agreed to do so, thereby insulating Moore from any prejudice by reason of the brief delay offered *sua sponte* by the court before he would have to decide finally whether to plead guilty or to go to trial. Thus we see that Mr. Ponds was far from ineffective in protecting his client's interest in reaching a full understanding of his options.

2.  Government's preparation for the suppression hearing

Moore next argues that, to the extent the district court considered Moore's litigation of the suppression motion in denying him the additional reduction under § 3E1.1(b)(2), "this Court should follow the majority of circuits in rejecting that basis for its ruling." *Compare, e.g., United States v. Marquez*, 337 F.3d 1203, 1211 (10th Cir. 2003) ("a district court may not penalize a defendant for bringing a non-frivolous motion to suppress by denying a reduction under subsection (b)(2)"), *with United States v. Rogers*, 129 F.3d 76, 80-81 (2d Cir. 1997) (denying defendant's request for reduction under § 3E1.1(b)(2) because, "in terms of preparation by the government and the investment of judicial time, the suppression hearing was the main proceeding in this case" and therefore defendant did not allow "the court or the government to avoid the burdens of

litigating the case").

In support of this argument, Moore points to the district court's observation: "Clearly the government prepared for trial and filed -- they didn't just have to prepare for a motions hearing but they had to file voir dire questions, other filings and jury instructions." This statement does not indicate the district court relied even in part upon the Government's preparation for the suppression hearing in denying Moore's request for the additional reduction; on the contrary, the court seems to have discounted that part of the Government's exertions. We therefore need not decide today whether such reliance is permissible.

3. Moore's request under § 3E1.1(b)(1)

Finally, we reject Moore's contention the district court did not rule upon his request for relief under § 3E1.1(b)(1), which allows for a third-level reduction for acceptance of responsibility where "the defendant ... timely provid[es] complete information to the government concerning his own involvement in the offense." In announcing Moore's sentence, the district court recited this provision verbatim and proceeded to deny Moore's request for the third-level reduction. Moore's claim that "the district court did not decide" whether "Moore timely provided complete information to the authorities about his involvement in the offense" is therefore without merit.

At any rate, as we saw above, it was Moore's unwillingness to admit he had committed the offense -- "what do you mean I've got to admit that I did it?" -- that derailed the district court's acceptance of his plea on April 25. More important, on June 9, after Moore had "discuss[ed] the guidelines extensively" with his new appointed counsel, he still wanted more time to "understand the plea" and decide whether to plead guilty or to

go to trial. Obviously, he had still not "provid[ed] complete information to the government concerning" his involvement in the offense.

## III. Conclusion

We agree with the district court that, based upon the totality of the circumstances, the police had a reasonable suspicion upon the basis of which to stop the taxicab in which Moore was riding. Further, the record of the April 25 hearing conclusively shows that counsel's assistance was not at all deficient, let alone constitutionally deficient. Moore's other claims are equally unavailing. Accordingly, both Moore's conviction and his sentence are

*Affirmed*.