Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 10, 2003          Decided July 22, 2003

No. 02-3021

UNITED STATES OF AMERICA,
APPELLEE

v.

ROCKY LEE BROWN,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00272-01)

———

*A.J. Kramer*, Federal Public Defender, argued the cause and filed the briefs for appellant.

*Lisa H. Schertler*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roscoe C.*

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Howard, Jr.*, U.S. Attorney, and *John R. Fisher* and *Elizabeth Trosman*, Assistant U.S. Attorneys.

Before: SENTELLE, ROGERS, and GARLAND, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

Dissenting opinion filed by *Circuit Judge* ROGERS.

GARLAND, *Circuit Judge*: Defendant Rocky Lee Brown submitted a conditional guilty plea to the charge of unlawful possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Police found guns and ammunition in a parked car in which Brown was sitting. The defendant now appeals from the district court's denial of his motion to suppress that evidence, contending that the police twice violated his Fourth Amendment rights: first, by opening the car's door; and second, by searching its trunk. We reject Brown's arguments and affirm the judgment of the district court.

I

At approximately 1:45 a.m. on April 14, 2001, Officers Joshua Branson and Michael Bryant of the Metropolitan Police Department arrived at an apartment building in Washington, D.C., in response to a citizen's call to the police. The citizen, Sharron Peterson, had reported that there had been a fight in the adjacent parking lot, that shots had been fired, and that a bullet had shattered the window of her child's bedroom while the child was sleeping. The officers knew the neighborhood to be the site of "a lot of drug activity" as well as "several shootings and several homicides" that year. Suppression Hr'g Tr., App. at 42.

When the officers arrived at Peterson's building, she pointed out a white Cadillac that was sitting in the parking lot. She told the officers that after hearing the gunshots, her sister — who, unlike Peterson herself, had been in the apartment at the time — opened the blinds and saw the men in the car looking up at her. The officers went to the parking lot, which was partially illuminated by street lights, and asked

the two men inside the white car to step outside. They then questioned the men for about half an hour.

While the officers were talking to the occupants of the white Cadillac, they noticed a black Cadillac, which was the only other occupied car in the lot, parked fifteen to twenty feet away. Officer Bryant watched as a man got out of the driver's seat of the black car. The man approached the officers and then stopped for a while, leaning on a fence and "observing [the officers], like it's a game going on." *Id.* at 54. Thereafter, he retreated toward the black car, continued watching for some time, and finally walked away down an alley, never to return. Officer Branson later testified that he regarded the man's behavior as "peculiar," *id.* at 39, noting that he "seemed to be eyeing out my partner and myself," *id.* at 41, and "sizing us up," *id.* at 44. Officer Bryant also observed another occupant of the black Cadillac, subsequently identified as defendant Brown, get out of the car and then get back inside. *Id.* at 66.

After they finished questioning the men in the white car, the officers decided to approach the black car and question its occupants because, the officers believed, they might either have "been involved with" or "observed" the earlier events in the parking lot. *Id.* at 57. Bryant approached with a lit flashlight. Although his vision of the interior of the car was obscured by the car's darkly tinted windows, Officer Branson could see "images of people." *Id.* at 41. As Branson approached the car, he saw "two people, one of [whom] got up from the rear seat and jumped over into the front seat." *Id.* Branson testified that this made him "even more suspicious" and "very cautious." *Id.*

Upon reaching the car, Officer Branson knocked on the rear passenger-side window, where he could see that one of the two occupants was sitting. When there was no response, Branson "cracked the door open" because he "wanted to make sure that [he and his] partner were safe." *Id.* at 43–44. Immediately upon opening the door, Branson observed a pistol on the floor of the back seat next to Brown's foot. Brown's hand was "right there . . . like it was tickling the

handle." *Id.* Branson immediately pulled Brown out of the car and handcuffed him. The other occupant, a female, was taken from the front passenger seat and handcuffed as well.

After searching the passenger compartment of the car, Officer Branson removed the keys from the ignition. He then opened the car's locked trunk. There, Branson found a shotgun bag containing an AR-15 semi-automatic rifle, along with several magazines filled with ammunition.

Brown was charged by a grand jury with one count of unlawful possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and one count of unlawful possession of a semi-automatic assault weapon, in violation of 18 U.S.C. § 922(v)(1). He filed a motion to suppress the evidence found in the car as the fruit of an unlawful search and seizure. Following an evidentiary hearing, the district court denied the motion. Brown then entered a conditional guilty plea to the first count of the indictment, reserving his right to appeal the suppression ruling. *See* FED. R. CRIM. P. 11(a)(2). The government dropped the second count after concluding that the AR-15 did not meet the statutory definition of an assault weapon. The defendant now appeals the denial of his motion to suppress.

## II

Brown contends that Officer Branson violated the Fourth Amendment's prohibition of unreasonable searches and seizures when he opened the car door, thereby rendering the subsequent seizure of the pistol unlawful. He further contends that, even if the opening of the door was legitimate, the police acted unconstitutionally when they searched the car's trunk and seized the rifle and ammunition they found inside. Accordingly, he argues that both guns, as well as the ammunition, should have been excluded from use as evidence at trial.

In response, the government maintains that the opening of the door was lawful under *Terry v. Ohio*, 392 U.S. 1 (1968), which permits officers to undertake an investigatory stop if they have a reasonable suspicion of criminal activity, and to

conduct a protective search for weapons if they have a reasonable fear for their safety. The government further argues that the search of the trunk was lawful under *United States v. Ross*, 456 U.S. 798 (1982), because discovery of the pistol in the passenger compartment provided probable cause to believe that there were additional weapons, ammunition, and/or other contraband in the trunk.

We decide de novo whether the police had reasonable suspicion, reasonable fear, and probable cause. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Christian*, 187 F.3d 663, 666 (D.C. Cir. 1999). However, we review the district court's "findings of historical fact only for clear error," and give "due weight to inferences drawn from those facts" and to the court's determinations of witness credibility. *Ornelas*, 517 U.S. at 699–700; *see Christian*, 187 F.3d at 666. Our analysis of the police conduct in question is objective: "[t]he principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." *Ornelas*, 517 U.S. at 696; *see Terry*, 392 U.S. at 21–22.

In Parts II.A and II.B, we consider the lawfulness of the door-opening and the trunk search, respectively.

## A

In *Terry v. Ohio*, the Supreme Court held that a police officer needs neither probable cause nor a warrant to conduct a brief investigatory stop of an individual if he has a reasonable suspicion that "criminal activity may be afoot." 392 U.S. at 30; *see United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The Court also held that, during such a stop, an officer may conduct a protective search of the outer layers of the suspect's clothing if he has a "reasonable fear" that the suspect is armed and dangerous. *Terry*, 392 U.S. at 30; *see Michigan v. Long*, 463 U.S. 1032, 1034 (1983). In order to justify such a stop and/or

search, the officer must be "able to point to specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. In *Michigan v. Long*, the Court extended the scope of a *Terry* search beyond the person of the suspect to the area "within his immediate control," including the passenger compartment of an automobile. 463 U.S. at 1049; *see Christian*, 187 F.3d at 668.

The parties appear to assume that the opening of the car door constituted both a stop and a search for *Terry* purposes, and we do so as well. Because the stop and the search were thus coincident, both the reasonable suspicion and reasonable fear elements of the *Terry* standard must be satisfied. *See Christian*, 187 F.3d at 668. In assessing those issues, we examine the totality of the circumstances, not any one factor individually. As we explained in *United States v. Edmonds*:

> An officer on the beat does not encounter discrete, hermetically sealed facts. Rather, as we repeatedly have cautioned, the question of whether reasonable suspicion existed can only be answered by considering the totality of the circumstances as the officer on the scene experienced them. . . . Hence, even though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors — especially when viewed through the eyes of an experienced officer — may.

240 F.3d 55, 59–60 (D.C. Cir. 2001) (citations omitted); *see also Arvizu*, 534 U.S. at 273; *Terry*, 392 U.S. at 22–23.

In this case, several circumstances support the reasonableness both of the officers' suspicion of criminal activity and of their fear of danger. The first circumstance is the fact that the incident took place in a neighborhood known for "a lot of drug activity" and in which, earlier that same year, there had been "several homicides" and "numerous calls for gunshots." Suppression Hr'g Tr., App. at 42; *see also* Appellant's Br. at 28 (describing the location as a "high crime neighborhood"). Although we agree with our dissenting colleague that an individual's presence in such an area, "standing alone, is not

enough to support reasonable, particularized suspicion that the person is committing a crime," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000), it is nonetheless true that "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis," *id. See Edmonds*, 240 F.3d at 60 ("[T]he probative value of a neighborhood's reputation as a high-crime area is firmly established."); *United States v. Johnson*, 212 F.3d 1313, 1316 (D.C. Cir. 2000). The importance of this factor is further compounded by the lateness of the hour. *See Long*, 463 U.S. at 1050 (listing the fact that "the hour was late" as one circumstance justifying officers' "reasonable belief that [the defendant] posed a danger"); *United States v. Roggeman*, 279 F.3d 573, 578–79 (8th Cir. 2002) (same); *United States v. Moore*, 235 F.3d 700, 704 (1st Cir. 2000) (same); *United States v. Ramires*, 307 F.3d 713, 716 (8th Cir. 2002) (listing the fact that "it was late at night" as one circumstance justifying a *Terry* stop).

The second relevant factor is the event that brought the officers to the parking lot in which Brown's car was parked: a report that gunshots had been fired from the lot into the window of a child's bedroom. That fact enhanced the probability that criminal activity had been committed, or was being committed, by someone inside one of the only two occupied cars in the lot. *See United States v. Raino*, 980 F.2d 1148, 1150 (8th Cir. 1992) (holding that a *Terry* stop was supported by the fact that "the officers were responding to a late-night call that shots had been fired in precisely the area appellant's car was parked"). It also strengthened the grounds for the officers' fear that the occupants of the car might be armed and dangerous. *Cf. id.* (holding that, where shots had been fired nearby, a police officer "acted reasonably in using extreme caution" as he approached a vehicle, since, if the officer's suspicion that the shots came from the vehicle proved correct, its occupant "would certainly be armed").

Brown raises several objections to our consideration of this factor. He argues that, because of the amount of time that

had passed since the shots had been fired,[1] it was unreasonable to connect the shots to the occupants of the black car. Although we agree that the passage of time lessened the shots' significance, it did not eliminate it entirely; it was certainly plausible that the person or persons who fired the gunshots might not have departed the area. Brown also objects on the basis of Sharron Peterson's testimony that the black car did not arrive in the lot until after the police began questioning the men in the white car, suggesting that the former was not there when the shots were fired. But the district court credited Officer Branson's statement that the police did not see the black car arrive, and thus that "either the car was present when [the officers] started to talk to the people in the white Cadillac or they did not see the black limousine come onto the parking lot and they made a reasonable assumption that it had been there at the point that they got to the parking lot." Suppression Hr'g Tr., App. at 165. We find no error in this analysis.[2]

---

[1]  The district court found that Peterson called the police department sometime between 10 and 12 p.m., and that the officers arrived around 1:45 a.m.

[2]  Although reasonable suspicion is an objective standard, it is nonetheless evaluated on the basis of "the totality of the circumstances *as the officer on the scene experienced them.*" *Edmonds*, 240 F.3d at 59 (emphasis added). For the same reason, this court cannot take into account many of the facts recounted in the dissenting opinion, as they were not known to the investigating officers at the time of the search. For example, although complainant Peterson subsequently testified that she was familiar with the black car, that it was often parked in the lot behind her apartment, that it was not in the parking lot at the time of the shooting, and that the white car had twice left the parking lot before returning, she did not tell the officers any of those facts. To the contrary, she said nothing whatsoever about the black car to the officers. Suppression Hr'g Tr., App. at 64, 92. Similarly, although Brown later told another officer that the other person in the car was his girlfriend, Officers Branson and Bryant did not know that at the time they searched the car and trunk. *Id.* at 80.

Brown also objects to the relevance of the gunshots on the ground that, when Peterson talked with the officers, she pointed out the white car rather than the black. But neither Peterson nor her sister had actually seen the gun being fired, and indeed, Peterson herself had not even been home at the time of the gunshots. Peterson told the police only that her sister had opened the blinds and seen people looking up at her from the white car *after* she heard the shots. *Id.* at 89–90. Thus, what the police knew was not inconsistent with the possibility that the shots had been fired from the black car. And once the police finished questioning the men in the white car, it was hardly unreasonable for them to turn their suspicions to the only other people in the lot.

Finally, both Brown and the dissent object that there was no evidence that the officers approached the black car because they believed that its occupants were participants in the gunfire rather than innocent bystanders or mere witnesses. This objection is wrong as a matter of fact and irrelevant as a matter of law. In context, it is clear that Officer Branson's testimony that he approached the black car "as if . . . doing a traffic stop," *id.* at 42, referred to his tactics and not to any assumption that the occupants were merely guilty of a "traffic violation," Dissenting Op. at 5. Branson testified that he was suspicious, and further testified that the officers approached the car because they believed its occupants might have *either* "observed" *or* "been involved" in the altercation. Suppression Hr'g Tr., App. at 41, 57. The officers were not required to resolve the occupants' status before stopping them, *see Wardlow*, 528 U.S. at 126, and in any event, the officers' actual motives do not bear on our objective assessment of reasonable suspicion. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (internal quotation marks omitted)); *Christian*, 187 F.3d at 670 (holding that an officer's "actual motives for conducting [a] search [are] not relevant as long as his actions [are] objectively reasonable").

A third circumstance supporting the officers' reasonable suspicion and fear was the activity of the man who got out of the black car, watched the officers for a while, and then disappeared down the alley. While a general curiosity about police activity would be insufficient to raise suspicion or concern, there was more than that here. Officer Branson described the behavior as "peculiar," and testified that the man "seemed to be eyeing out my partner and myself" and "sizing us up." Suppression Hr'g Tr., App. at 41, 44. *See Arvizu*, 534 U.S. at 275–76 (citing relevant factors including the defendant's stiffened posture and his children's "methodical, mechanical, abnormal" waving to police, "certainly . . . a fact that is odd" (quotation marks omitted)); *Terry*, 392 U.S. at 23 (citing the fact that men repeatedly walked back and forth between a street corner and store window); *United States v. Bravo*, 295 F.3d 1002, 1008 (9th Cir. 2002) (citing the defendant's "overly-friendly" demeanor toward a U.S. Customs inspector); *United States v. Mancillas*, 183 F.3d 682, 686, 697 (7th Cir. 1999) (citing the fact that, when an officer arrived, three occupants exited a car and walked away in different directions).[3]

Brown objects that the officers could not have been particularly concerned about this man since they did not follow him down the alley to question him. But reasonable officers could well have decided to focus their attention on the remaining occupants of the cars, rather than to take off after the pedestrian or to divide their forces. As "appellate judges we do not second-guess a street officer's assessment about the order in which he should secure potential threats" or investigate his suspicions. *Christian*, 187 F.3d at 669. Moreover,

---

[3] Although the dissent correctly observes that the government conceded at oral argument that the officers would not have had reasonable suspicion based on this man's behavior *alone*, the government was also careful to state that his behavior was nonetheless one of several factors that in combination generated the necessary level of suspicion. We may not reject the relevance of a factor simply because viewed "in isolation" from the others it is insufficient. *Arvizu*, 534 U.S. at 274. As the Supreme Court only recently reminded us, "*Terry* . . . precludes this sort of divide-and-conquer analysis." *Id.*

the subjective concerns of these particular officers are, once again, irrelevant to the legal analysis. *See Horton v. California*, 496 U.S. 128, 137–38 (1990); *Terry*, 392 U.S. at 21–22.[4]

A fourth factor is the behavior of the remaining two passengers in the black car, one of whom "got up from the rear seat and jumped over into the front seat" as the officers approached. Suppression Hr'g Tr., App. at 41. It is well settled that an individual's furtive movements may be grounds for reasonable suspicion and fear, justifying a *Terry* stop and search. *See Wardlow*, 528 U.S. at 124 (recognizing that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *Edmonds*, 240 F.3d at 61; *Christian*, 187 F.3d at 668; *United States v. Green*, 465 F.2d 620, 623 (D.C. Cir. 1972). It is true that "furtive gestures 'are significant only if they were undertaken in response to police presence,' [a]nd a suspect can respond to the presence of a police officer only if he has recognized him as an officer." *Edmonds*, 240 F.3d at 61 (quoting *Johnson*, 212 F.3d at 1316). But there was more than a sufficient basis for the officers to believe that they had been recognized: they were in uniform; their patrol car was marked; one of the passengers (later identified as Brown) had previously gotten out of the black car while the officers were questioning the men from the white car not far away; and Officer Bryant carried a lit flashlight as he approached the black car.

It is of course possible that it was merely a coincidence that the passenger jumped from the back seat to the front at the very moment the officers came near. But the possibility of such a coincidence does not negate the officers' reasonable suspicion and fear, nor does the fact that the passenger's behavior did not necessarily indicate criminal activity or prospective danger.[5] As the Supreme Court has made clear,

---

[4] For the same reasons, we reject Brown's contention that, because the officers spent so much time talking with the men in the white car, there must not have been anything suspicious about the black car or its occupants.

[5] Brown's brief intimates that all that was involved was amorous activity that the couple did not wish the police to observe.

that an individual's conduct is "ambiguous and susceptible of an innocent explanation" does not mean that it may not be grounds for suspicion: "*Terry* recognized that . . . officers could detain [such] individuals to resolve the ambiguity." *Wardlow*, 528 U.S. at 125–26; *see also Arvizu*, 534 U.S. at 277 (holding that a "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct").

We cannot agree with the dissent's suggestion that characterizing the passenger's behavior as "furtive" in this circumstance is equivalent to holding that "any reaction to seeing the police is indicative of criminal complicity." Dissenting Op. at 5. Jumping over a car seat as an officer approaches is not just "any reaction." Moreover, although we again note the Supreme Court's instruction that the officers' subjective reactions to this behavior are not relevant to the analysis, *see, e.g.*, *Horton*, 496 U.S. at 137–38, we disagree that there was no testimony that the officers considered "that conduct, or other conduct by the occupants, to be aberrations . . . that reinforced their suspicion." Dissenting Op. at 5. In fact, Officer Branson testified that the passenger's jump from the back seat made him "even more suspicious." Suppression Hr'g Tr., App. at 40.

In addition to these four circumstances, each of which supports both the officers' suspicion of criminal activity and their fear of physical harm, two other factors dramatically increased the risk that the encounter posed to the officers, and hence provide additional grounds justifying that fear.[6] First, the *Terry* stop that the officers were about to undertake involved not a pedestrian but the occupants of an automobile. As the Supreme Court noted in *Long*, "investigative detentions involving suspects in vehicles are especially

---

[6] We agree with our dissenting colleague that neither of these two factors "excuse[s] *Terry*'s requirement that the police possess adequate suspicion to conduct a stop in the first place." Dissenting Op. at 9–10. It is the preceding four factors that justify the stop; the last two merely provide additional support for the reasonable fear that justifies the search.

fraught with danger to police officers." 463 U.S. at 1047; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (noting the "inordinate risk confronting an officer as he approaches a person seated in an automobile"). Recent cases make clear that this danger continues to be significant. *See Maryland v. Wilson*, 519 U.S. 408, 413 (1997); *United States v. Holt*, 264 F.3d 1215, 1222–23 (10th Cir. 2001) (citing 1999 statistics).

Second, the windows of the black Cadillac were darkly tinted, preventing the officers from having a clear view of the car's occupants. This fact magnified the danger of approaching unknown individuals inside an automobile, because the tinting made it impossible to know whether one of the occupants was reaching for a weapon — as it appears Brown was doing — or otherwise acting to endanger the officers' safety. As the Fourth Circuit said in *United States v. Stanfield*:

> When, during already dangerous traffic stops, officers must approach vehicles whose occupants and interiors are blocked from view by tinted windows, the potential harm to which the officers are exposed increases exponentially, to the point, we believe, of unconscionability. Indeed, we can conceive of almost nothing more dangerous to a law enforcement officer in the context of a traffic stop than approaching an automobile whose passenger compartment is entirely hidden from the officer's view by darkly tinted windows. [The officer] has no way of knowing whether the vehicle's driver is . . . reaching for a gun; he does not know whether he is about to encounter a single law-abiding citizen or to be ambushed by a car-full of armed assailants.

109 F.3d 976, 981 (4th Cir. 1997) (emphasis omitted).

In sum, the officers who stopped Brown and searched the car in which he was sitting were faced with the following circumstances: Late at night, in an area known for crime and gunfire, and in a parking lot where shots had been fired that very night, they came upon two occupied parked cars. While they were questioning men in one of the cars, an individual got out of the other and "sized them up" and "eyed them out"

before disappearing down an alley. Thereafter, as the officers approached the second car to question its remaining occupants, one of the rear passengers jumped over a seat into the front. Any other activity by the occupants, as well as their position and that of any weapons they might possess, was obscured by tinted glass. We conclude that, based on the totality of these circumstances, reasonable officers could both suspect the possibility of illegal activity and be concerned for their safety.[7] And because our decision is based on *all* of these circumstances, we do not suggest that "whenever the police approach a car in the course of investigating a shooting late at night, . . . the police may intrude on the personal security of the occupant of a car based on a person's mere presence in a high-crime neighborhood." Dissenting Op. at 9.

Faced with these circumstances, Officer Branson undertook a stop and search of the most minimal kind: he merely cracked open the car door and looked inside without breaking the plane of the car's surface. *Cf. Wilson*, 519 U.S. at 415 (holding that the "additional intrusion" imposed on passengers by ordering them out of a car during a traffic stop "is minimal"); *Mimms*, 434 U.S. at 111 (same regarding drivers); *Stanfield*, 109 F.3d at 982–83 (holding that the privacy intrusion effected by police opening a car door is "considerably less" than that approved by the Supreme Court in *Mimms*). Moreover, the stop "lasted a mere matter of moments . . . before the discovery of the gun [in plain view] ripened what had been merely reasonable suspicion into the full-scale probable cause necessary for an arrest." *United States v. Hensley*, 469 U.S. 221, 236 (1985) (Brennan, J., concurring). Thus, because "the officer's action was justified at its inception, and . . . was reasonably related in scope to the circumstances which justified" it, *Terry*, 392 U.S. at 19–20, the stop and the search were valid.

---

[7] Because these factors are sufficient to establish reasonable suspicion and reasonable fear, we need not consider whether the occupants' failure to respond to Officer Branson's knock is yet another factor in support of both.

Brown does not contest that, if the opening of the door was lawful, Officer Branson was entitled to seize the gun that was in plain view. *See Long*, 463 U.S. at 1050. Accordingly, because we conclude that the opening of the door was lawful, the seizure was as well, and the district court did not err in denying the motion to suppress the gun. *See Edmonds*, 240 F.3d at 62–63.

## B

After arresting Brown and seizing the pistol found in the passenger compartment of the black Cadillac, Officer Branson proceeded to open the car's trunk. There, he discovered and seized an AR-15 semi-automatic rifle and several magazines filled with ammunition. Brown contends that the trunk search violated the Fourth Amendment, and that the evidence it yielded must be suppressed for that reason.

The government does not suggest that the opening of the trunk was justified as a *Terry* search, as such searches are limited to areas immediately accessible to the suspect — in this case, to the passenger compartment of the car. *See Long*, 463 U.S. at 1048–49; *Christian*, 187 F.3d at 668. Rather, the government argues that, after finding a gun on the floor of the passenger compartment, Branson had probable cause to search the trunk to see whether more guns, ammunition, and/or other contraband were stored there. In *Carroll v. United States*, 267 U.S. 132 (1925), the Supreme Court upheld the validity of a warrantless automobile search based on probable cause to believe that the vehicle contained contraband. In *United States v. Ross*, the Court held that the "scope of a warrantless search of an automobile . . . is defined by the object of the search and the places in which there is probable cause to believe that it may be found." 456 U.S. 798, 824 (1982). "If probable cause justifies the search of a lawfully stopped vehicle," the Court said, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 824–25. The question before us, therefore, is whether the police had probable cause to believe that contraband might be found in the trunk

of the black Cadillac or, as we put it in *United States v. Turner*, "whether the trunk was one of several parts of the vehicle that 'might contain the object of the search.'" 119 F.3d 18, 20 (D.C. Cir. 1997) (quoting *Ross*, 456 U.S. at 821).

In *Turner*, we applied *Ross* in upholding the search of a car's trunk. The search in *Turner* followed a traffic stop, during which the police officer had noticed three pieces of evidence: a strong smell of marijuana emanating from the car; pieces of torn cigar tobacco in the defendant's lap, which the officer testified were consistent with the use of a hollowed-out cigar "blunt" to smoke marijuana; and a ziplock bag containing a "green, weed-like material" that the officer believed to be marijuana. *Id.* at 18–19. We concluded that this evidence was sufficient to meet the requirements of probable cause: that is, "'a fair probability that contraband or evidence of a crime'" would be found in the trunk. *Id.* at 20 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). In so holding, we rejected Turner's argument that the evidence indicated nothing more than personal use of marijuana and that a person who uses rather than distributes drugs would keep them within his immediate control rather than in a luggage compartment. *Id.* at 20–21. While we agreed that "it may be true that evidence of narcotics distribution would constitute even stronger cause to believe additional contraband had been secreted in the trunk," we found the evidence sufficient "to establish a 'fair probability' that Turner might have hidden additional drugs not necessary for his current consumption in areas out of plain sight, including the trunk of the car." *Id.* at 20.

We reach a similar conclusion here for several reasons. First, the presence of a gun supported the possibility that the car contained ammunition, additional weapons, and/or other contraband. As we have held in the context of *Terry* searches and in that of searches incident to arrest, "the presence of one weapon may justifiably arouse concern that there may be more in the vicinity." *Christian*, 187 F.3d at 669; *see United States v. Abdul-Saboor*, 85 F.3d 664, 670 (D.C. Cir. 1996) ("[H]aving already uncovered a loaded handgun, a loaded semi-automatic pistol, and a magazine, the

arresting officers could well anticipate that other weapons were stowed throughout the apartment . . . ."). Moreover, the presence of the gun suggested that drugs may have been in the vicinity as well. *Cf. United States v. Conyers*, 118 F.3d 755, 757 (D.C. Cir. 1997) (noting the connection between guns and drugs); *United States v. Dunn*, 846 F.2d 761, 764 (D.C. Cir. 1988) (describing a revolver as "a tool of the narcotics trade" and holding that the defendant's "connection to the gun suggest[ed] he exercised control over the drugs in the house"). Second, multiple gunshots had reportedly been fired that night from the lot in which the black car was parked. This fact increased the likelihood that multiple guns were present, as did the fact that there had been at least three people in the car that night. Finally, the fact that Brown's hand was "drooping down" and "tickling the handle" of the gun as Officer Branson opened the door, Suppression Hr'g Tr., App. at 44, suggested that Brown may have been using the gun to protect other contraband. It was reasonable to infer that the trunk was a likely hiding place.

We do not perceive any material difference between this case and *Turner*. If anything, possession of a firearm under these circumstances provides a stronger basis for a trunk search than does evidence of personal use of marijuana. The dissent suggests that one difference is that in *Turner*, the government offered testimony concerning a missing trunk key found in the defendant's shoes. Dissenting Op. at 12. But in *Turner* we expressly declined to consider the significance of that testimony because there was a dispute over whether the key had been lawfully seized. *Turner*, 119 F.3d at 20 n.2. We "instead limit[ed] ourselves to considering only the three pieces of evidence" that we have described above. *Id.*

Brown suggests a different distinction, noting that in *Turner* we said that the police officer's "testimony, based on his experience in narcotics and traffic enforcement, *supports*" the conclusion that there was probable cause to search the trunk, *Turner*, 119 F.3d at 20 (emphasis added), and further notes that in this case Officer Branson did not specifically testify about the trunk search. But *Turner* did not hold that such

testimony is a necessary element of a probable cause determination, and we do not think such testimony was required here. The presence of the gun, along with the other factors identified in the previous paragraph, was sufficient to establish probable cause.[8]

Finding little to distinguish Brown's case from Turner's, we are left with Brown's argument that *Turner* was wrongly decided. *Turner*, of course, is the law of the circuit and may not be overturned by a subsequent panel. *See, e.g.*, *National Mining Ass'n v. Fowler*, 324 F.3d 752, 760 (D.C. Cir. 2003). But even if that were not the case, we would not overturn it, since we find Brown's argument unpersuasive.

The defendant's principal attack on *Turner* is his contention that this court misread *Robbins v. California*, 453 U.S. 420 (1981). *Turner* cited *Robbins* — a case in which marijuana and equipment for using it were found in a car's passenger compartment — because the Supreme Court stated in dictum that the subsequent search of the car's luggage compartment was lawful. Relying on facts recited in the California appellate court decision that the *Robbins* Court reviewed, *People v. Robbins*, 103 Cal. App. 3d 34, 38 (Cal. Ct. App. 1980), Brown claims that the validity of the search was based not on the marijuana but on an incriminating statement made by the defendant. But as we have recently said in rejecting a similar argument in another case, "one can examine the Supreme Court's opinion with a microscope without learning that fact." *Rancho Viejo v. Norton*, 323 F.3d 1062, 1072 (D.C. Cir. 2003). The *Robbins* Court did not mention the

---

[8] Brown further contends, and the dissent suggests, that the trunk search was unlawful because Officer Branson did not testify that he opened the trunk in search of additional contraband; rather, he testified that he did so to secure Brown's belongings. Like the test for reasonable suspicion under *Terry*, however, the test for probable cause is objective. *See Whren*, 517 U.S. at 813 ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Thus, Branson's "actual motives for conducting the search were not relevant as long as his actions were objectively reasonable." *Christian*, 187 F.3d at 670.

incriminating statement, and we find the defendant's resort to the judicial equivalent of legislative history unconvincing.[9]

In any event, whether supportive or not, there is certainly nothing in *Robbins* that is contrary to the holding of *Turner*.[10] Moreover, *Robbins* was only one of several decisions upon which *Turner* relied, and it remains true today — as it was then — that our resolution of the lawfulness of the trunk search in *Turner* is consistent with that of every other circuit that has considered a similar question.[11] As the cases cited in

---

[9] Brown also argues that *Turner* is inconsistent with *Michigan v. Long*, noting that although *Long* concluded that a hunting knife and marijuana were lawfully discovered in the passenger compartment of a car, it did not go on to reach the question of the legality of the subsequent trunk search but instead remanded the issue to the state court. The Court, however, made quite clear that the reason for the remand had nothing to do with the merits of the issue. *See Long*, 463 U.S. at 1053 ("[W]e decline to address this question because it was not passed upon by the Michigan Supreme Court, whose decision we review in this case.").

[10] Nor is there anything to the contrary in *California v. Acevedo*, 500 U.S. 565 (1991), upon which the dissent relies. In *Acevedo*, in the course of upholding a trunk search, the Supreme Court observed in dictum that a search of the rest of the car would have been unreasonable. *Id.* at 580. As we explained in *Turner*, however, "[i]n *Acevedo* . . . the police had been following a particular parcel of drugs — one the police actually had intercepted, examined, and resealed — and had watched as the suspect bag was placed in the trunk." *Turner*, 119 F.3d at 22–23. By contrast, in *Turner* as well as in this case: " '[S]uspicion was not directed at a specific container.' . . . Rather, . . . the police had probable cause to search 'every part of the vehicle and its contents that may conceal the object of the search,' " and "[n]either logic nor case law excludes [the] trunk from the list of such locations." *Id.* at 23 (quoting *Ross*, 456 U.S. at 825).

[11] *See, e.g.*, *United States v. Fladten*, 230 F.3d 1083, 1086 (8th Cir. 2000) (holding that drug paraphernalia on the backseat of a car parked near a house where drug-related activity took place provided probable cause for a trunk search); *United States v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995) (holding that drugs and a gun found in a passenger compartment, in combination with the odor of

note 11 suggest, although probable cause determinations are fact-specific and depend on the totality of the circumstances, the discovery of contraband in the passenger compartment of a car is a factor that strongly supports the lawfulness of a trunk search. In this case, we conclude that the totality of the circumstances provided probable cause to search the black Cadillac for guns, ammunition, and/or narcotics, and that the trunk was a part of the vehicle that "might contain the object of the search." *Turner*, 119 F.3d at 20 (quoting *Ross*, 456 U.S. at 821).

## III

We hold that Officer Branson did not violate the Fourth Amendment, either when he opened the door to the car in which appellant Brown was sitting or when he subsequently opened and searched the car's trunk. The district court's denial of Brown's motion to suppress is therefore

*Affirmed.*

———

marijuana smoke, provided probable cause to search the trunk, although the odor alone would have been insufficient); *United States v. Kelly*, 961 F.2d 524, 527–28 (5th Cir. 1992) (holding that a gun, drugs, and ammunition found in a passenger compartment, as well as the smell of marijuana, conferred probable cause to search the entire car, including the engine compartment); *United States v. McGuire*, 957 F.2d 310, 314 (7th Cir. 1992) (holding that open alcohol containers in the passenger compartment justified a trunk search); *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir. 1986) (holding that a small amount of marijuana found on a car's floor provided probable cause for a trunk search); *United States v. Rickus*, 737 F.2d 360, 367 (3d Cir. 1984) (holding that a screwdriver, pliers, and bulletproof vests found in a car's passenger compartment justified a trunk search); *United States v. Haley*, 669 F.2d 201, 204 (4th Cir. 1982) (holding that marijuana odor and a bag of marijuana found in a car were sufficient to support a trunk search).

1

ROGERS, *Circuit Judge*, dissenting: Because the government failed to offer evidence to show that, prior to opening the door of the lawfully parked car in which Brown was sitting, the police had articulable suspicion to believe that Brown had been engaged in criminal wrongdoing, the stop and frisk exception to the Fourth Amendment warrant requirement adopted in *Terry v. Ohio*, 392 U.S. 1 (1968), is inapplicable. In *Terry*, the Supreme Court cautioned that a police officer's "inchoate and unparticularized suspicion or 'hunch,'" would not suffice to justify an intrusion into a person's security and privacy, *id.* at 27, but that is all the evidence showed. Hence the seizure by the police after opening the car door was unlawful. Moreover, even if there had been a lawful *Terry* stop, because the search of the car trunk was not limited in scope in order to protect the officers, it could not be justified under *Terry*, *id.* at 29, and because the government failed to show that the officers had probable cause to believe the car trunk contained contraband or evidence of a crime, the seizure from the trunk also was unlawful. Accordingly, the district court erred in denying the motion to suppress the seized evidence.

**I.**

Under *Terry*, a police officer must have articulable suspicion of individualized criminal wrongdoing before the officer can conduct a brief investigatory stop of the individual and subject him to a pat down. 392 U.S. at 23. The "criminal activity [that] may be afoot", *id.* at 30, quoted Op. at 5, must be tied to an individual before that individual can be stopped. *Terry* operates on the assumption that individuals are law-abiding which is why there must be a "particularized suspicion . . . that the particular individual being stopped is engaged in wrongdoing." *United States v. Cortez*, 449 U.S. 411, 418 (1981). Consistent with "independent appellate review of these ultimate determinations of reasonable suspicion and probable cause," *Ornelas v. United States*, 517 U.S. 690, 697 (1996), nothing in the record indicates that Brown or the other occupants of the black car acted in a manner to provoke police suspicion of criminal wrongdoing, *see Illinois v. Ward-*

*low*, 528 U.S. 119, 124–26 (2000), or that the police were relying on their experience to conclude that the occupants of a car other than the one identified by the complainant presented a threat to the officers' safety. *Cf. Texas v. Brown*, 460 U.S. 730, 742–43 (1983). The government offered no evidence to show that the police had reason to think that the black car contained guns or other contraband but relies, in justifying the *Terry* stop, solely on the police officers' generalized suspicions as a result of their surroundings. Reasonable suspicion for *Terry* purposes is not created, as other circuits have recognized, by the totality of the evidence when each piece of evidence is, by itself, a weak indicator of criminal activity or dangerousness. *See, e.g., United States v. Townsend*, 305 F.3d 537, 542–45 (6th Cir. 2002); *United States v. Gray*, 213 F.3d 998, 1000–01 (8th Cir. 2000); *United States v. Jones*, 149 F.3d 364, 369–71 (5th Cir. 1998). Brown's mere presence in the parking lot late at night several hours after a shooting does not meet the standard of articulable suspicion of individualized criminal wrongdoing that *Terry* requires. *See Brown v. Texas*, 443 U.S. 47, 52 (1979).

Looking at the "totality of the circumstances," *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *Cortez*, 449 U.S. at 417–18), to determine whether the police conducted a lawful *Terry* stop, the court ignores the consequences of the fact that key evidence is undisputed. First, the police did not arrive at the scene until at least two hours, and more likely, three hours, after the shooting had occurred. The complainant called the police for assistance around 10 p.m. Even taking the latest time that the complainant testified she called for assistance, at midnight, the police did not receive a call to respond until 1:45 a.m. and did not arrive at her apartment building until after 1:45 a.m. Only after conferring with the complainant and her sister, and then going to the complainant's apartment, did the police enter the parking lot. Second, the complainant and her sister directed the police only to the men in a white car, and said nothing about the black car or its occupants. At the suppression hearing, the complainant explained that the black car was not in the parking lot at the time of the shooting, whereas (according to the complainant's

sister) at the time of the shooting and also when the police arrived in the complainant's apartment, the men in the white car were looking up at the window of the complainant's apartment into which shots had been fired. Third, Brown, who was sitting in the black car when the police began questioning the men in the white car, remained in or near the black car throughout the thirty minutes that the police testified they questioned the men in the white car, and Brown did not attempt to leave the parking lot thereafter when the police approached. Although the occupants of the black car were aware that the police were questioning men in the white car, they never attempted to interfere with the police investigation. These undisputed facts known to the officers demonstrate that when the police first entered the parking lot, they had articulable suspicion as to the occupants of the white car but no reason to suspect the occupants of the black car of any criminal activity. Nor did the subsequent conduct of the occupants of the black car give the police any reason to suspect any of the occupants of criminal activity.

The court relies on four circumstances to justify the *Terry* stop of Brown. The first circumstance is the neighborhood: it was known for "a lot of drug activity" and there had been several homicides and numerous calls for gunshots earlier the same year. Op. at 6. While conceding that mere presence is insufficient, the court views the lateness of the hour as somehow "compound[ing]" the relevance of this circumstance. Op. at 7. High-crime areas abound in urban centers such as Washington, D.C., and the fact that crime is often committed at night does not help identify the likely perpetrator of a particular crime. Neither the fact that the complainant lived in a neighborhood where shootings had occurred in the past year, nor the fact that it was late at night, gave the police reason to suspect that Brown was involved in the earlier shooting.

The second circumstance is that gunshots had been fired into a child's bedroom: the court states that this "enhanced the probability" that the shots had been fired by someone inside one of the only two occupied cars in the parking lot.

Op. at **7**. This statement assumes that the shooter was in a car in the parking lot. Even if this assumption is reasonable, the court also assumes that if the shooter had been in a car in a parking lot, he likely could be found in a car in the same parking lot several hours later. The evidence suggests the contrary. Not only did the police arrive several hours after the shooting had occurred, the complainant testified at the suppression hearing that after the shooting the white car had twice left the parking lot before returning, thus further indicating that sufficient time had elapsed for the shooter to come and go. In addition, the complainant was familiar with the black car in which Brown was sitting, as it often parked in the lot and played loud music, and testified that the black car was not present at the time of the shooting or when the police responded to her 911 call. Given her familiarity with the car, it is difficult to understand why she would not have told the police about the black car if it had been in the parking lot at the time of the shooting. The court discounts the complainant's testimony because she and her sister did not see the actual shooter, Op. at 8–9, and yet they identified the suspect car that was in the parking lot at the time of the shooting and no other car.

The third circumstance is the activity of the man who exited the alley. Op. at 10. The government conceded at oral argument that the police did not have articulable suspicion to stop the man who got out of the driver's seat of the black car, came closer to look at the police at the white car, which was approximately fifteen feet away, walked back towards the black car, and then before reaching it left the parking lot through an alley. Given this concession and the fact that after exiting the alley the driver never returned to the black car or to the parking lot, it is difficult to understand how his conduct contributes to the officers' articulable suspicion of criminal wrongdoing with respect to Brown and the other occupant who remained in the car. The only testimony indicated that the police thought that the driver was "sizing [them] up" and "act[ed] quite peculiar . . . as if he wanted to be involved in our conversation with these two gentlemen [in

the white car]." Yet the police acknowledged that the driver said nothing to them and went on his way.

The fourth circumstance is the behavior of the remaining occupants of the black car. Op. at 11. According to the evidence, all that happened after the driver exited the black car and left through the alley was that (1) Brown briefly exited the car and got back in, and (2) as the police, upon finishing their questioning of the men in the white car, approached the black car, a person jumped from the back seat to the front seat of the car. Characterizing these actions as "furtive gestures" in response to seeing the police, Op. at 11, means, however, that any reaction to seeing the police is indicative of criminal complicity and thus, as the Fifth Circuit points out, destroys the inference. *See Jones*, 149 F.3d at 370–71. There was no testimony that when one of the occupants jumped from the back to the front seat of the black car, the officers considered that conduct, or other conduct by the occupants, to be aberrations or a "furtive gesture" that reinforced their suspicion of criminal involvement. *See United States v. Edmonds*, 240 F.3d 55, 61–62 (D.C. Cir. 2001). Instead, Officer Branson testified that he "felt uneasy" and "was very cautious at that time." He did not testify that the police approached the black car because they thought the occupants were involved in the earlier shooting. Rather, Officer Branson testified that they sought to verify the complainant's story by asking whether the occupants of the black car had seen or heard the prior shooting. He also testified in speculative, vague language that he wanted to know "[w]hether or not *perhaps* they *might* have been involved with what was going on." (emphasis added). And so he approached the black car "as if . . . doing a traffic stop," and opened the door "to make sure that [he] and [his] partner were safe." In other words, having nothing to go on that identified the occupants of the black car as likely suspects in the prior shooting or otherwise involved in criminal activity, the police proceeded based on an assumed traffic violation although the black car was lawfully parked in a residential parking lot.

Cobbling together innocent circumstances, and drawing inferences in favor of the government that are unsupported

by the evidence, *see United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002), the court concludes that because Brown (who was in a different car than the one identified by the complainant for the police) was in the wrong place (the parking lot behind the complainant's apartment building) at the wrong time (late at night several hours after a shooting), the police had articulable suspicion that he was engaged in criminal wrongdoing. Op. at 13–14. The stop and frisk exception under *Terry* is unrecognizable. While the police may reasonably take into account the fact that they are conducting an investigation in a high-crime area, *see Edmonds*, 240 F.3d at 60, late at night, *see Townsend*, 305 F.3d at 542–43, and that they are investigating a crime involving a gun, *see United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir. 1992), these factors provide only generalized suspicions that are insufficient to justify an intrusion on an individual's Fourth Amendment rights. *See Edmonds*, 240 F.3d at 60. While relevant, the context of the police investigation, as this court has noted, provides no "individualized suspicion of wrongdoing." *United States v. Davis*, 270 F.3d 977, 979 (D.C. Cir. 2001).

The government, relying on Officer Branson's testimony, failed to present a " 'particularized and objective basis' for suspecting legal wrongdoing," *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 417–18), by any occupant of the black car. Officer Branson implicitly acknowledged the limited effect of all four circumstances on which the court relies when he testified before the grand jury and later at the preliminary hearing that he and the other police officer only wanted to question the occupants of the black car to determine whether they had any information about the earlier shooting. Even crediting Officer Branson's changed testimony at the suppression hearing that he also wanted to determine whether the occupants of the black car "perhaps . . . might have been involved with what was going on," he never explained what facts led him to believe that the occupants of the black car, as opposed to those in the white car, were connected to the earlier shooting. For example, he did not testify that he had any information from the men in the white car that linked the

occupants of the black car to the shooting. Under *Terry*, being generally "suspicious" and feeling "uneasy" is not sufficient.

Further, unlike the officer in *Terry*, 392 U.S. at 28, who explained why, in his experience, the conduct he observed was not innocent but was consistent with potential thievery from stores, or the border patrol officer in *Arvizu*, 534 U.S. at 269–71, who explained why a pattern of behavior by a minivan and its occupants indicated likely smuggling of drugs or illegal aliens, or the officer in *Edmonds*, 240 F.3d at 60–61, who explained why the defendant's actions were consistent with someone trying to hide something under a car seat, Officer Branson never explained how being "sized up" by the driver, or how the "furtive gesture" of an occupant moving from the back to the front seat, or how Brown's conduct made him suspect criminal activity by the occupants of the black car. Moreover, with respect to the threat that Officer Branson perceived, there is no testimony to explain why the conduct of the occupants of the black car as opposed to the general circumstances surrounding the police investigation created a reasonable fear other than Officer Branson's own subjective perception of the situation. *See* Op. at 9.

The objective evidence supports the desire of the police to question the occupants of the black car about the shooting, but when the police are collecting information rather than acting on articulable suspicion of criminal wrongdoing, there are limits on the manner in which they may intrude upon an individual's Fourth Amendment rights. *See Terry*, 392 U.S. at 34–35 (White, J., concurring); *Gomez v. Turner*, 672 F.2d 134, 140–41 (D.C. Cir. 1982) (citing *United States v. Wylie*, 569 F.2d 62, 66–67 (D.C. Cir. 1977)); *United States v. Ward*, 488 F.2d 162, 169–70 (9th Cir. 1973). Although the intrusion on Brown's personal security, *see Michigan v. Long*, 463 U.S. 1032, 1046–47 (1983); *Terry*, 392 U.S. at 9, may have been minimal when compared to an intrusion into someone's home, the Supreme Court has established that in the absence of a specific belief of criminal activity or dangerousness by the person stopped, the intrusion is unlawful. *See Long*, 463 U.S. at 1051; *Terry*, 392 U.S. at 27. Because the government

bears the burden of proof, *see Mincey v. Arizona*, 437 U.S. 385, 390–91 (1978); *Davis,* 270 F.3d at 982, in the absence of any evidence of an articulable basis for the officers' suspicion of criminal wrongdoing or the reason they were concerned for their safety, the court should not draw such inferences in the government's favor. *See Myers*, 308 F.3d at 255. The court thus misses the point when it states that "[t]he officers were not required to resolve the occupants' status before stopping them . . . ." Op. at 9. To conduct a *Terry* stop and search, the officers were required to have an articulable suspicion specific to the occupants of the black car before infringing on Brown's Fourth Amendment rights.

The court points to two factors as supportive of the officers' "additional grounds justifying [this] fear" of physical harm as they approached the black car. Op. at 12–13. First, the police were approaching an automobile. Second, the black car's tinted windows obscured the officers' view inside the car. The court acknowledges, however, that these factors provide no support for the *Terry* stop itself. Op. at 12 n.6. Although neither officer gave any specific reason, other than the general circumstances surrounding the investigation of the earlier shooting, that would cause them to fear for their own safety from the occupants in the black car, *see Long*, 463 U.S. at 1049 n.14, the court considers these factors sufficient to fill the evidentiary gap with respect to the search. Op. at 12 n.6.

For the first factor, however, the court relies on cases in which the police already had a basis to conduct a *Terry* stop and search. Op. at 12–13. For example, in *Long*, 463 U.S. at 1050–51, the defendant was speeding, swerved his car into a ditch and appeared intoxicated when the police questioned him, and during questioning, the police observed a large knife in the interior of the defendant's car; in *Maryland v. Wilson*, 519 U.S. 408 (1997), and *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), the defendants were subjected to a *Terry* stop and search after committing traffic violations. Officer Branson's testimony indicated that the police did not have grounds to suspect Brown was involved in the earlier shooting or other criminal activity; he testified that he approached the black

car "as if . . . doing a traffic stop." Even if Officer Branson only meant by that phrase to describe a police procedure, it is nonetheless telling that at no point did he testify that he suspected the occupants of the black car as being involved in the earlier shooting. Rather, the police sought out the occupants of the black car to question them as possible witnesses or because the police were suspicious of them based on "inarticulate hunches," *Terry*, 392 U.S. at 22, arising primarily from the general context of the police investigation. Under the court's analysis, whenever the police approach a car in the course of investigating a shooting late at night, even a shooting that occurred several hours earlier, the police may intrude on the personal security of the occupant of a car based on a person's mere presence in a high-crime neighborhood. *Terry* requires more. The predicate to a " 'stop and frisk' " under *Terry* is "that police do not need probable cause to conduct a brief, investigatory stop of an individual if they are 'able to point to specific and articulable facts which, taken together with rational inferences from these facts,' give rise to a reasonable suspicion of criminal activity" by that individual. *United States v. Christian*, 187 F.3d 663, 668 (D.C. Cir. 1999).

The second factor, obscured vision due to the black car's tinted windows, also does not relieve the police of their obligations under *Terry*. The court quotes *United States v. Stanfield*, 109 F.3d 976 (4th Cir. 1997), Op. at 13. However, in that case the car with tinted windows was illegally parked in the middle of the road, and the driver, a known drug-dealer, was engaged in a conversation with another known drug-dealer, who was leaning out of the window of a second-floor apartment building. *Id.* at 978, 981–82. By contrast, there was no evidence that the police had any grounds to think the occupants of the black car, which was lawfully parked in a residential parking lot, were guilty of a traffic violation or engaged in any criminal activity. At best, the tinted windows gave reason for the police to be more cautious when conducting a permissible *Terry* stop and search based on an articulable suspicion of individualized criminal activity, but the obscured-vision circumstance did not excuse *Terry*'s

requirement that the police possess adequate suspicion to conduct a stop in the first place. So far as the government's evidence indicated, the occupants of the black car were innocent, uninvolved bystanders and no more. *See Arvizu*, 534 U.S. at 277.

Other cases relied upon by the court are not analogous to the instant case. Almost nothing in *Raino*, 980 F.2d at 1150, *see* Op. at 7, is similar. In *Raino*, there was no information available to the police about the source of the second of three shooting incidents, the defendant's car was double parked, and the defendant, who looked nervous, began to pull away. *Id.* at 1149. Other cases relied on by the government are distinguishable as Brown made no attempt to flee, *see Wardlow*, 528 U.S. at 121–22; *United States v. Smith*, 217 F.3d 746, 749–50 (9th Cir. 2000), and in *Smith*, the police officer had more than mere flight as grounds to suspect the individual defendant of criminal wrongdoing.

Failing to distinguish between police questioning of witnesses to a crime and questioning of likely criminal suspects, the government relies on authority that allows the stop of a potential witness when the crime "has just been committed." 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.2(b), at 24 (3d ed. 1996). In such circumstances, the police must question potential witnesses immediately or very soon after the crime has taken place, *see id.* at 24–25, and in any event, in less time than the two to three hours that elapsed here. Even under the district court's condensed view of the lapse of time between the shooting and the arrival of the police at the scene, the "just committed" exception has no bearing; hours had passed and, as the complainant testified, there was sufficient time for the white car to leave the parking lot twice after the shooting before returning prior to the arrival of the police. The court does not embrace this part of the government's argument, for Brown could "not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Florida v. Royer*, 460 U.S. 491, 498 (1983) (citing *United States v. Mendenhall*, 446 U.S. 544, 556 (1980)); *see*

*Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). If, as the government maintains, a *Terry* stop did not occur when the police knocked on the car window, Brown was free to ignore a consensual encounter. *Cf. Berkemer*, 468 U.S. at 439. Hence, the court properly does not rely on the failure of the occupants in the black car to respond to the officer's knock on the car window. *See* Op. at 14 n.7.

## II.

*Terry* also is instructive about the scope of the search that can be justified to protect an officer's safety. See Op. at 12 n.6. "The sole justification of the search in the present situation [of a *Terry* pat down] is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. The police removed Brown and the female occupant from the car and handcuffed them before taking the keys out of the ignition and opening the trunk of the car. Once the occupants were handcuffed, and because the trunk was not in any event immediately accessible to them, the rationale for a *Terry* search beyond the immediate surroundings of the passenger compartment evaporates. *See Long*, 463 U.S. at 1049; *Christian*, 187 F.3d at 670.

The government, consequently, does not rely on *Terry* for the search of the trunk but instead argues that finding the gun next to Brown in the passenger compartment of the black car gave the officers probable cause to search the trunk for other guns, ammunition, or other contraband. The court agrees, relying principally on *United States v. Turner*, 119 F.3d 18 (D.C. Cir. 1997). Op. at 16–18. Its reliance on *Turner* is misplaced.

In *Turner*, the police stopped the defendant's car because it did not have a front license plate. 119 F.3d at 18. As the officer approached the car he noticed "a strong odor of burnt marijuana" coming from the car. *Id.* After the defendant was unable to produce his driver's license, the officer saw

"torn pieces of cigar tobacco" in the defendant's lap, on the seat between his legs, and on the floor at his feet. *Id.* The government introduced evidence that in the officer's experience these observations were consistent with marijuana use. *Id.* The officer also saw, directly behind the defendant, "a clear plastic bag of green, weed-like material," which the officer believed to be marijuana. *Id.* at 18–19. Moreover, although this court did not rely on evidence that the defendant had hidden the key to the trunk in his shoes, the government offered evidence that in the officer's experience a missing trunk key is often concealed on a person's body, including his shoes. *Id.* at 19. On appeal, Turner did not dispute there was probable cause for the police to search the passenger compartment of his car, but contended that the evidence was consistent only with his personal drug use and hence there was no probable cause to believe there would be additional drugs in the trunk. *Id.* at 20. The court rejected the personal drug use distinction and upheld a warrantless search of the trunk citing *United States v. Ross*, 456 U.S. 798, 824 (1982), and *Robbins v. California*, 453 U.S. 420, 428 (1981). *See Turner*, 119 F.3d at 21. Under the circumstances shown by the evidence, the court held there was probable cause for the officer to search the trunk for drugs, distinguishing cases where police suspicion was directed at a specific container. *Id.* at 20, 23.

By contrast with the evidence in *Turner*, the evidence in the instant case shows only that Brown was in possession of a single handgun in a lawfully parked car late at night several hours after a shooting in the same area. There was no evidence that the police had reason to think that more than one gun was involved in the earlier shooting or that the gun seized was a different type of gun than the one that was used in the shooting. This case is not like those in which there are indicia of multiple firearms or other contraband. In *United States v. Abdul–Saboor*, 85 F.3d 664, 666, 670 (D.C. Cir. 1996), cited by the court, Op. at 16, while executing a bench warrant the police observed the defendant pick up a loaded pistol and saw a loaded semi-automatic pistol and magazine on a table. In other cases on which the court relies, Op. at 17, the police

had information that the defendant was in possession of drugs and thus had reason to think that the defendant also may have a gun, as in *United States v. Conyers*, 118 F.3d 755, 757 (D.C. Cir. 1997), where a detailed tip from a confidential informant alerted the police to the likelihood that the defendant would be transporting drugs, or in *United States v. Dunn*, 846 F.2d 761, 764 (D.C. Cir. 1988), where the defendant was in a townhouse that served as a retail drug operation and a gun was on a couch. There also was no evidence that the police had information to link Brown or the other occupants of the black car to unlawful drug activity; nor was there testimony that the police relied on their experience to conclude that the occupants of the black car were likely involved in unlawful drug or other criminal activity. Neither was there evidence of flight. Brown and the other occupant had remained in the immediate area knowing the police were questioning men in another car; they were in a car that was not the one that the complainant and her sister had told the police was in the parking lot at the time of the shooting. Furthermore, before the search of the trunk it appears that the police knew that the black car was not registered to Brown. Brown testified that he told the police he had been given use of the car by a third man and was using the car to be with his girlfriend, although Officer Branson testified that he did not hear Brown's explanation.

In any event, unlike *Turner*, the government failed to present evidence showing that probable cause existed to search the trunk of the black car. The court engages in pure speculation – suggesting that Brown may have been using the gun to protect other contraband such as drugs, and that there may have been multiple guns, Op. at 16–17 – that has no evidentiary basis, much less sufficient evidence to demonstrate that the police had probable cause to search the trunk. There was no evidence, as there was in *Turner*, that the police relied on their experience in concluding there was a fair probability that there was contraband in the trunk of the black car. Indeed, the court ignores the evidence that Officer Branson's reason for searching the trunk had nothing to do with contraband; he was concerned about protecting the

police department against civil liability for valuables that might be in the trunk. While Officer Branson's subjective motive is not determinative, it is informative of the objective circumstances in light of his testimony that it was because he saw personal items in the passenger compartment of the car, as though someone was living there, that he decided to open the trunk to check for valuables. It was the appearance of the passenger compartment, as distinct from finding a gun or suspecting that the occupants of the black car were involved in the prior shooting or unlawful drug activity, that resulted in the opening of the trunk. Thus, to defend the correctness of the holding in *Turner*, as the court does, Op. at 18–20, does not also demonstrate that its rationale is properly extended beyond its moorings.

In *California v. Acevedo*, 500 U.S. 565, 580 (1991), the Supreme Court reaffirmed its long-standing principle regarding the permissible scope of warrantless searches of automobiles based on probable cause to believe there is contraband or evidence of a crime to be found in a car: the search can go no further than is necessary to discover the object of the search supported by probable cause. In *Acevedo*, the Court upheld the search of a bag in the trunk of a car where the police had probable cause to believe that the bag contained marijuana, while observing that because "the police did not have probable cause to believe that contraband was hidden in any other part of the automobile . . . a search of the entire vehicle would have been . . . unreasonable under the Fourth Amendment." *Id.* The Court reemphasized that " 'searches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.' " *Id.* (quoting *Mincey*, 437 U.S. at 390); *Ross*, 456 U.S. at 824. It remains true, as the Supreme Court instructed in *Carroll v. United States*, 267 U.S. 132, 156 (1925), that "[i]n cases where the securing of a warrant is reasonably practicable, it must be used . . . ."

For these reasons the conclusion follows that the evidence demonstrated why the police would want to question the occupants in the black car as potential witnesses to the

shooting earlier that night. It was another occupied car in the parking lot when the police were questioning the men in the white car. The complainant testified that the black car often parked in the lot behind her apartment house. Because the police were investigating a shooting they had reason to proceed cautiously, and did so, entering the parking lot with their guns drawn. But the evidence did not show that the police had more than "inarticulate hunches" that Brown or the other occupants of the black car were involved in the earlier shooting, much less in any other criminal activity. Perhaps, consistent with "the central teaching of th[e Supreme] Court's Fourth Amendment jurisprudence," the government might have been able to present evidence that would meet the "demand for specificity in the information upon which police action is predicated," *Terry*, 392 U.S. at 21 n.18, to support the admission against Brown of the evidence seized without a warrant from the lawfully parked car in which he was sitting with his girlfriend. However, it is not the role of the court to fill in the gaps by rejecting evidence that was presented and speculating about evidence the government might have presented. *See Myers*, 308 F.3d at 255. The government bears the burden of proof, and under *Terry*, the government must present evidence that the police officer was able to articulate the specific facts that caused him to view Brown as a likely suspect in the earlier shooting. Otherwise, as *Mincey*, *Terry*, and the Supreme Court's jurisprudence on warrantless car searches make clear, there is no principled limit on invasions by the police of a person's security and privacy if a mere "hunch" suffices. Accordingly, because there was no evidence to show that the police had articulable suspicion of criminal wrongdoing by Brown to justify a stop and seizure under *Terry*, or that there was probable cause for a warrantless search of the car trunk for contraband or evidence of a crime, the district court erred in denying the motion to suppress the evidence, and I respectfully dissent.